Commonwealth *v.* Davenport, Appellant.

236

Argued April 27, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*J. Peirce Anderson,* with him *Bean, DeAngelis, Kaufman & Kane,* for appellant.

*Stewart J. Greenleaf,* Assistant District Attorney, with him *William T. Nicholas,* First Assistant District Attorney, and *Milton O. Moss,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE POMEROY, July 2, 1973:

Appellant, Herman Miller Davenport, was convicted by a jury of murder in the first degree for the killing of Milton Hawkins on January 14, 1970. Sentence of life imprisonment was imposed, and appellant brought the instant appeal. For reasons which follow, we reverse and remand for a new trial.

238

## I

At the end of the second day of trial, the Commonwealth called to the stand appellant's co-felon, William Clifford Bartlett. In response to defense counsel's request for an offer of proof, a side-bar conference was held. The district attorney informed the court that Bartlett had earlier given a confession to the police implicating appellant, and that the Commonwealth hoped he would repeat the substance of this statement in the jury's presence. Bartlett's attorney was in court and informed the trial judge at side-bar that several hours earlier his client had expressed his intention to invoke the Fifth Amendment.[1] The district attorney admitted that "there is a strong possibility, probability, that if Mr. Bartlett did take the stand he would take the Fifth Amendment. I am hoping he wouldn't. There is no way, I think, anyone can be sure until the man is put to the test."[2] Over the strenuous objection of appellant's counsel, the Commonwealth's call of Bartlett to the stand was allowed. With the exception of questions relating to the name and address of the witness, all questions were met with a claim of privilege. A requested cautionary instruction that the jury not draw an adverse inference from the alleged co-conspirator's refusal to testify was refused.

In *Namet v. United States,* 373 U.S. 179, 10 L. Ed. 2d 278 (1963), the Supreme Court of the United States

---

[1] Bartlett had already been tried by a jury and convicted of first degree murder for his complicity in the slaying of Hawkins. His post-trial motions were then pending and sentence had not as yet been imposed. Subsequently, the motions were denied and Bartlett was sentenced to life imprisonment. On appeal, we affirmed. *Commonwealth v. Bartlett,* 446 Pa. 392, 288 A. 2d 796 (1972).

[2] The record of the side-bar conference indicates that Bartlett's counsel suggested that his client be questioned personally by the court outside of the jury's presence to ascertain whether or not he would invoke his Fifth Amendment privilege. The trial judge declined to do so.

recognized the potential prejudice if a witness called by the prosecution and logically associated with the defendant is allowed to invoke the Fifth Amendment in the presence of the jury.[3] In two recent cases similar to the one at bar we have had occasion to indicate why such a practice is to be condemned. *Commonwealth v. Terenda*, 451 Pa. 116, 301 A. 2d 625 (1973); *Commonwealth v. DuVal*, 453 Pa. 205, 307 A. 2d 229 (1973). The calling of the witness whom the district attorney had reason to know would refuse to testify "presented the jury with an irrelevant event (invocation of the privilege) from which the jury could make fallacious deductions prejudicial to the defendant and not subject to cross-examination." *DuVal*, supra at 214.

The Commonwealth alleges that no error was committed in this case because when Bartlett was called to the stand, the prosecution believed in good faith that his right to invoke the Fifth Amendment had been lost by his earlier trial and conviction.[4] As we said in *DuVal*,

---

[3] Following *Namet*, this Court in *Commonwealth v. Greene*, 445 Pa. 228, 285 A. 2d 865 (1971), held that to permit *the defendant* to call a witness whom he has reason to believe will invoke the Fifth Amendment, thereby inviting the jury to infer from the witness' silence his guilt and not the defendant's, is also objectionable.

[4] Whether in fact Bartlett had lost his Fifth Amendment privilege as a result of the earlier conviction presents an interesting question. Interpreting a legislative grant of immunity for witnesses compelled to testify before federal grand juries investigating alleged violations of the federal narcotics laws, the Supreme Court of the United States in *Reina v. United States*, 364 U.S. 507, 5 L. Ed. 2d 249 (1960), dismissed appellant's contention that the privilege existed so long as part of his sentence remained to be served. It was held that immunity statutes need only safeguard against future *prosecutions* in order to comport with the Fifth Amendment. Wigmore had earlier taken the same position. 8 Wigmore, *Evidence* (3d ed. 1940), §2279. Various state courts have gone beyond this constitutional minimum and have viewed the privilege as not so easily lost. In addition to the waiver-by-conviction position, it has been held that (1) conviction must have been

however, a case where the Commonwealth asserted that by testifying on prior occasions the witnesses had waived their Fifth Amendment rights, the validity *vel non* of the claim of privilege is immaterial. It is a question which can and should be settled outside the presence of the jury. It is also clear, as in *DuVal*, that the district attorney had actual notice of Bartlett's intention to take the Fifth Amendment; we therefore need not explore what steps, if any, the Commonwealth should be required to take in advance in order to ascertain the willingness of a witness to testify.

## II

The proceedings below were infirm for a second reason. On January 20, 1970, at the instigation of the police, the Montgomery County Coroner extracted a blood sample from appellant to type and compare with that of the deceased. This action was taken without prior judicial authorization and while appellant was confined in the local jail. We conclude that appellant's rights under the Fourth Amendment were violated and that his timely motion to suppress should have been granted. A new trial must therefore be ordered on this ground also.

That the taking of blood is a search and seizure subject to the protections of the Fourth Amendment was firmly established in *Schmerber v. California*, 384 U.S. 757, 16 L. Ed. 2d 908 (1966). See also *Commonwealth v. Murray*, 441 Pa. 22, 271 A. 2d 500 (1970). Cf. *United*

---

followed by sentencing; (2) the full sentence must have been served; or (3) sentence must have been imposed and the time for direct appellate review expired. See generally, 9 ALR 3d 990 (1966), and cases cited therein. It is clear that the Commonwealth could have successfully forced Bartlett to testify only by application of the conviction rule. Pennsylvania courts have heretofore not taken any position on this question, and in light of our holding, we need not do so today. Cf. *Snyder Appeal*, 398 Pa. 237, 157 A. 2d 207 (1960), relied upon in *DuVal*, supra.

*States v. Dionisio,* 410 U.S. 1, 35 L. Ed. 2d 67 (1973); *United States v. Mara,* 410 U.S. 19, 35 L. Ed. 2d 99 (1973). In *Schmerber,* a delay in testing for alcoholic content threatened "destruction of the evidence"; consequently, exigent circumstances permitted a warrantless intrusion. The Supreme Court has recently given its imprimatur to warrantless scraping under a suspect's fingernails "to preserve the highly evanescent evidence" thought to be there. *Cupp v. Murphy,* 412 U.S. 291, 296, 93 S. Ct. 2000, 2004 (1973). No such dangers, however, excused the warrant requirement here. Whereas the percentage of alcoholic content in the bloodstream begins to diminish shortly after drinking stops and a person can easily scrub his hands to destroy incriminating evidence, the blood type of an individual never changes. Similar characteristics of fingerprints prompted the Supreme Court of the United States in *Davis v. Mississippi,* 394 U.S. 721, 728, 22 L. Ed. 2d 676, 681 (1969), to hold that "the general requirement that the authorization of a judicial officer be obtained in advance of detention would seem not to admit of any exception in the fingerprinting context."

To circumvent the warrant requirement, the Commonwealth argues that appellant consented to the procedure that was employed. The suppression testimony of the Coroner fails to bear out this position: "Q. Now what happened when Herman Davenport came into the room? A. I said we wanted to take a blood test of him. Q. Did he say anything? A. He did not. Q. What did he do, if anything? A. He sat there until we got the syringes and tubes ready, and the corpsman, or whoever the man is that works in the dispensary, asked him to put out his arm and took the blood sample. Q. Did he put out his arm? A. Yes. Q. Did he say anything during this period of time, do you recall? A. Not that I recall." In *Bumper v. North Carolina,* 391 U.S. 543, 548-9, 20 L. Ed. 2d 797, 802 (1968), the Supreme

Court of the United States held that "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." We recognize that in *Bumper* the police misrepresented to the defendant's mother that they had a valid warrant to search her home and that no such tactic of deception was employed by the police here. The distinction, however, is irrelevant. It is obvious that appellant's holding out his arm, without being told either the authority for the doctor's actions or the purpose for which the blood sample was being taken, constituted mere acquiescence, and not a knowing and intelligent waiver of defendant's Fourth Amendment rights. *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed. 1461, 1466 (1938).[5]

Since a new trial will be required, we turn to a consideration of one other issue which will necessarily be involved in future proceedings.[6]

---

[5] At appellant's suppression hearing the district attorney, no doubt realizing the tenuous legal foundation for the original blood seizure, presented a search warrant application to the court for a second blood sampling. Although admitting that probable cause existed and that the results of the second test would be identical to those of the first, defense counsel nevertheless opposed this application as prejudicial, since it was made after the motion to suppress and so close to trial. The court deferred its ruling on this application pending resolution of the motion to suppress. As the initial search was ultimately upheld, the warrant never was considered. Whether or not the warrant is valid is, of course, not a question on this appeal.

[6] In addition to the three issues discussed in the text, appellant also alleges as error (1) the overruling of his demurrer to the evidence and motion for a directed verdict, and (2) the introduction of certain photographs taken from inside the deceased's house looking out so as to show the lighting in the street. We have carefully examined these contentions and find both to be without merit.

## III

Appellant contends that the seizure of certain articles of blood-stained clothing linking him to the murder of Hawkins should have been suppressed as violative of the Fourth Amendment. On Monday, January 19, 1970, armed with an arrest warrant,[7] a large contingent of police officers representing Philadelphia, Montgomery County and Cheltenham Township, proceeded to appellant's rooming house. Ascending the stairs to the third floor, they spotted appellant coming out of his room. He was immediately placed under arrest and frisked for weapons in the doorway to his one-room apartment. Wearing only pants and a T-shirt, appellant asked to be allowed to finish dressing before being escorted to the police station. According to uncontradicted testimony at the suppression hearing, appellant went back into his room accompanied, however, by four or five policemen. The room was approximately 9x12 feet, furnished only with a bed and dresser. While retrieving appellant's shoes, socks, and shirt, one Detective Vance noticed and seized a pair of trousers from the bed, some rags from atop the bureau, and a denim jacket hanging from a hook on the open closet door, all noticeably stained with blood.[8]

Appellant contends that because the police had both probable cause and time to obtain a search warrant, and failed to do so, the articles seized at his apartment should have been suppressed. We disagree. In *Harris v. United States*, 390 U.S. 234, 236, 19 L. Ed. 2d 1067,

[7] The probable cause supporting this arrest warrant was not challenged. It was issued, inter alia, on the basis of William Bartlett's statement, referred to earlier in the text, implicating appellant in the murder.

[8] Testimony at the suppression hearing showed that as a precautionary measure, appellant was told to remain seated on his bed while the police retrieved these items of clothing.

1069 (1968), the Supreme Court of the United States said: "It has long been settled that objects falling in the plain view of an officer *who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.*" (Citations omitted; emphasis added.) This rule has been recognized by our Superior Court in *Commonwealth v. Watkins,* 217 Pa. Superior Ct. 332, 272 A. 2d 212 (1970). The Supreme Court later amplified the "plain view" doctrine as follows: "The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. . . . Where . . . the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous—to the evidence or to the police themselves —to require them to ignore it until they have obtained a warrant particularly describing it." *Coolidge v. New Hampshire,* 403 U.S. 443, 466-8, 29 L. Ed. 2d 564, 583-4 (1971).[9]

It is, of course, well settled that the police are justified in searching, incident to a valid arrest, "the arrestee's person and the area 'within his immediate control' —construing that phrase to mean the area from within which he might gain possession of a weapon or de-

---

[9] While the language quoted above is taken from Mr. Justice STEWART's *plurality* opinion in *Coolidge,* it is clear from the separate opinions of Justices WHITE and BLACK that the plurality treatment of the "plain view" doctrine and the Fourth Amendment was more restrictive than that favored by the rest of the Court, who would not impose any "inadvertence" limitation on the doctrine. As there is no dispute that the officers in this case did not have any advance notice that the bloody clothing would be found in appellant's apartment and did discover it "inadvertently", it is clear that the division among the members of the Supreme Court of the United States does not affect our disposition today.

structible evidence." *Chimel v. California*, 395 U.S. 752, 763, 23 L. Ed. 2d 685, 694 (1969). Whether or not appellant's return to his room at his own request to finish dressing extended the permissible scope of a search incident to a lawful arrest to that area, there can be no doubt that the police justifiably accompanied him inside his room to insure against flight or the procurement of a weapon. As the blood-stained items were in plain view and logically related to the investigation of Hawkins' murder, we uphold their warrantless seizure.[10]

Judgment of sentence reversed; case remanded for a new trial.

Mr. Justice ROBERTS, Mr. Justice NIX, and Mr. Justice MANDERINO concur in the result.

Mr. Chief Justice JONES dissents.

----

[10] Appellant's argument that the plain view doctrine applies only to inherently contraband goods is without merit. In *Warden v. Hayden*, 387 U.S. 294, 301, 18 L. Ed. 2d 782, 789 (1967), the Supreme Court of the United States held that the Fourth Amendment cannot support a distinction between "mere evidence" on the one hand and instrumentalities, fruits of a crime, or contraband on the other hand. This principle has recently been cited with approval in *Coolidge v. New Hampshire*, supra, 403 U.S. at 464, 29 L. Ed. 2d at 582.