432 A.2d 198

COMMONWEALTH of Pennsylvania, Appellee,

v.

Anthony Joseph VIRTU, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 26, 1980.

Decided July 17, 1981.

William F. Manifesto, Manifesto, Doherty, Love & Talarico, P.C., Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Kemal A. Mericli, Deputy Dist. Attys., Pittsburgh, for appellee.

Before O'BRIEN, C.J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

KAUFFMAN, Justice.

This is an appeal from an interlocutory order of the Allegheny County Court of Common Pleas denying the pre-trial motion of appellant, Anthony Joseph Virtu, to dismiss a criminal complaint on double jeopardy grounds.[1] Because the record conclusively reveals that the initial trial was aborted as a direct result of deliberate prosecutorial misconduct, we conclude that appellant may not be retried, and, accordingly, reverse.[2]

On the night of August 6, 1977, a fire was set in a Pittsburgh beauty salon located above a pizza shop owned by Michael Romeo ("Romeo"). A disagreement over access to a stairway leading to the salon had been an ongoing source of bad feeling between Romeo and the salon owner, and had culminated earlier on the day of the fire with the arrest of Romeo and one of his employees, Frank Spinelli ("Spinelli"), pursuant to the salon owner's private complaint, on charges of harassment and disorderly conduct. Shortly after the fire had been set, three badly burned men, including appellant, appeared at a Pittsburgh hospital. Of the three, only appellant survived.

Appellant was subsequently charged with arson, conspiracy to commit arson, and murder in connection with the beauty salon fire and the death of the other two burn victims. The decedents were Spinelli and Umberto Sandoval ("Sandoval"), who lived with Romeo at the time of the fire.

In May, 1978 a hearing was held in the Allegheny County Court of Common Pleas on a motion to suppress evidence seized in an automobile search and to suppress statements

1. Jurisdiction is vested in this Court pursuant to the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, 42 Pa.C.S.A. § 722.

2. We accept this interlocutory appeal pursuant to our holding in *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977). Under *Bolden*, an order denying a pre-trial motion to dismiss charges on double jeopardy grounds is immediately appealable. See *Commonwealth v. Santiago*, 492 Pa. 297, 424 A.2d 870 (1981); *Commonwealth v. Haefner*, 473 Pa. 154, 373 A.2d 1094 (1977).

made by appellant while in the hospital. During the hearing, the Commonwealth called Romeo as a witness, but he immediately invoked his Fifth Amendment privilege against self-incrimination and refused to testify. The suppression court ordered Romeo to answer questions seeking his name, his residence and prior residence, and whether he knew Spinelli, Sandoval and appellant. When asked whether he was the owner of the pizza shop, however, Romeo again invoked his Fifth Amendment privilege. After a side bar discussion, the assistant district attorney, Edward Fagan ("Fagan"), withdrew the question and asked Romeo if he had seen Spinelli, Sandoval, and appellant on the morning of August 7, 1977. Romeo replied in the affirmative, but when asked where he had seen them, he again invoked his privilege against self-incrimination and declined to answer. The suppression judge informed the district attorney that he would not order Romeo to testify further unless the Commonwealth agreed to grant him immunity. Court was adjourned until the following morning. At that time, the Commonwealth withdrew the witness.

Trial commenced in January, 1979 before the same judge who had presided at the suppression hearing. When it was brought to his attention that the prosecution expected to call Romeo, the trial judge inquired whether he was the same person who had refused to testify at the suppression hearing. In response, Fagan misrepresented the facts:

The Court: Let's go with this. Before you go, this Romeo, that one I think is the owner of the Pizza Shop, the one who took the Fifth Amendment—

Mr. Fagan: He didn't take the Fifth—

The Court: Didn't he at the Suppression Hearing?

Mr. Fagan: He testified—

The Court: If he's the one that brought him to the hospital?

Mr. Fagan: He testified, would you like to look at the record?

The Court: All I am—I don't care to. All I am trying to avoid is if he is going to take the Fifth, I would like to know if he has counsel.

Mr. Fagan: He has.[3]

Romeo was, in fact, the same person who had asserted his privilege against self-incrimination and declined to testify at the suppression hearing.

Before Romeo took the witness stand at trial, his attorney, John Knorr ("Knorr"), informed the prosecutor that Romeo would again invoke his Fifth Amendment privilege. Despite this unmistakably clear warning, Fagan chose to call Romeo as a witness. After responding to questions eliciting his name, his then current address, and his address as of August, 1977, Romeo replied to a question about the period of his residence at the latter address, but when asked with whom he lived in August of 1977, he asserted his Fifth Amendment privilege and refused to answer.

The court called counsel to side-bar, and counsel for appellant immediately requested a mistrial. After an extended discussion, the court ruled that the witness had properly asserted his Fifth Amendment rights and would be permitted to continue to do so if questioned further. Alleging that the prosecutor had called Romeo as a witness despite the known certainty that he would refuse to testify on grounds of self-incrimination, appellant's counsel reiterated his demand for a mistrial. The jury, counsel argued, had been irreparably prejudiced against the defendant by the prosecutor's deliberate misconduct.

Appellant's counsel further accused the prosecutor of deception during the earlier side-bar discussion in which the court had inquired about Romeo's assertion of his Fifth Amendment privilege at the suppression hearing. In reply to this serious charge, Fagan disingenuously stated, "He [Romeo] did not take the Fifth [at the suppression hearing] because he responded to questions."[4] Fagan admitted, however, that prior to Romeo's appearance on the stand, he had

3. N.T. January 29, 1979, pp. 29–30.

4. N.T. January 29, 1979, p. 84.

been advised that Romeo would invoke the Fifth Amendment privilege. The court requested a transcript of the earlier side-bar interchange and scheduled a hearing on the mistrial motion for the following morning.

At that hearing, the court, having reviewed the transcript of its side-bar exchange with Fagan, admonished him for his misconduct:

THE COURT: Could this not all have been avoided, Mr. Fagan, if when . . . I inquired of you with regard as to whether or not he took the Fifth Amendment at a previous date and you said he did not. Now the record does—

MR. FAGAN: He did invoke it then.

THE COURT: So, could we not have avoided this at this stage by telling me that that was the witness, yes, the same witness and going into a hearing outside the presence of the jury, which is what the Supreme Court said we should do in all of these types of cases, and then the Court makes its ruling. We could have avoided this while mess, is that right?[5]

After brief further discussion and argument, the Court, noting our decision in *Commonwealth v. Wright*, 456 Pa. 511, 321 A.2d 625 (1974), decided that the jury had been incurably prejudiced, and granted the motion for a mistrial.[6]

Trial was re-scheduled for June 4, 1979. In March, 1979, however, appellant filed his motion to dismiss the complaint, alleging that Fagan's conduct constituted a deliberate attempt to force him to move for a mistrial, or was, at the

5. N.T. January 30, 1979, pp.88–89.

6. In *Wright, supra*, we cited *Commonwealth v. Davenport*, 453 Pa. 235, 308 A.2d 85 (1973); *Commonwealth v. Duval*, 453 Pa. 205, 307 A.2d 229 (1973); and *Commonwealth v. Terenda*, 451 Pa. 116, 301 A.2d 625 (1973), for the principle that "[I]t is reversible error for the prosecution, once informed of a witness' intention to claim a privilege against self-incrimination, to call that witness to the stand before the jury where the witness is likely to be thought by the jury to be associated with the defendant in the incident or transaction out of which the criminal charges arose." 456 Pa. at 512, 321 A.2d at 626. The trial court concluded that the jury clearly had associated the witness with appellant, and the Commonwealth has not contested that fact here or at any of the proceedings below.

least, prosecutorial overreaching designed to prejudice his prospects for acquittal. Based upon these allegations, appellant argued that pursuant to various decisions of this Court and the United States Supreme Court, retrial would unconstitutionally place him in jeopardy for a second time.[7]

At a hearing on the motion held before the Honorable Loran L. Lewis, Fagan denied any intention to cause a mistrial or to seek unfair advantage by causing the witness to assert his Fifth Amendment privilege before the jury. He claimed that his intended questions at trial went no farther than those asked and answered at the suppression hearing.[8] Judge Lewis accepted Fagan's representations and, concluding that he did not deliberately provoke a mistrial, denied appellant's motion to dismiss. This appeal followed.

7. We set forth the circumstances under which prosecutorial misconduct would be the basis for a claim of former jeopardy, thus precluding retrial of a defendant, in *Commonwealth v. Starks*, 490 Pa. 336, 416 A.2d 498 (1980):

The United States Supreme Court has enunciated principally two types of prosecutorial overreaching. First there is the prosecutorial misconduct which is designed to provoke a mistrial in order to secure a second, perhaps more favorable, opportunity to convict the defendant. See *United States v. Dinitz*, 424 U.S. 600, 611 [96 S.Ct. 1075, 1081, 47 L.Ed.2d 267] (1976). Second there is the prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant. See *Lee v. United States*, 432 U.S. 23, 32 [97 S.Ct. 2141, 2146, 53 L.Ed.2d 80] (1977). *United States v. Dinitz, supra*, 424 U.S. at 611 [96 S.Ct. at 1081]. In contrast to prosecutorial error, overreaching is not an inevitable part of the trial process and cannot be condoned. It signals the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against.

490 Pa. at 341, 416 A.2d at 500.

8. Fagan's claim was untruthful. At the suppression hearing, Romeo refused to testify to his ownership of the pizza shop and his association with appellant and the two decedents because, as the owner of the shop, he was suspected of involvement in a conspiracy to commit arson against the beauty salon whose owner had, on the day of the fire, brought criminal charges against him and his employee, Spinelli. At trial, Fagan's offer of proof with respect to the materiality of Romeo's testimony indicated that the prosecution sought to question Romeo specifically concerning his ownership of the pizza shop and his association with Spinelli, Sandoval, and appellant.

Appellant here argues, as he did below, that Fagan's conduct at trial was either a deliberate attempt to provoke a mistrial or bad faith harassment designed to prejudice his chances for acquittal. He notes (1) the deception which occurred during the side-bar conference; (2) the warning, communicated to Fagan before Romeo was called as a witness at trial, that he intended to invoke his privilege against self-incrimination;[9] and (3) the indisputable similarity between the line of questioning contemplated at trial and the questions ruled protected at the suppression hearing.[10]

The Commonwealth seeks to explain the prosecutor's misbehavior by suggesting (1) that in his side-bar interchange with the trial court, Fagan only meant to say that the witness had not taken the Fifth Amendment to questions asked at the suppression hearing which the court had ruled unprotected by the privilege; (2) that his reply to the warning from Romeo's counsel occurred only because he contemplated a legally invalid assertion of the privilege; and (3) that Fagan sincerely believed that his questions would not provoke a legitimate assertion of the witness' Fifth Amendment rights.[11]

**9.** At the hearing on the motion to dismiss the charges, Romeo's attorney related under oath the following exchange with the prosecutor:

A. Between Commonwealth witnesses during the morning session, and I think it was right after Mr. Cuchini testified, I approached Mr. Fagan and advised him that I represented Mr. Romeo, who had been served with a Commonwealth subpoena, and I advised him that it was Mr. Romeo's intention to invoke the privileges of the Fifth Amendment, should he be called to testify.

Q. Did you, sir, receive any answer from Mr. Fagan?

A. Yes, I did.

Q. What, if anything, did he say to you?

A. Mr. Fagan pointed to the stand, to the witness stand, and said well, then, *he's going to have to take it up there.* (Emphasis supplied).

**10.** See note 8, supra.

**11.** The Commonwealth's third contention rests upon Fagan's claim that his intended line of questioning at trial would have gone no farther than the questions which had been asked and answered at the suppression hearing. As indicated in note 8, *supra,* Fagan's offer of proof at trial conflicts with this contention. The disingenuousness of

The Commonwealth's argument is unconvincing. Rather than seek a ruling on the applicability of the privilege against self-incrimination outside the presence of the jury, the prosecutor deliberately called a witness who already had claimed his Fifth Amendment privilege on the substance of the proof sought. Even more damaging is the indisputable fact that the prosecution had *actual knowledge* of the witness' intent to exercise his Fifth Amendment privilege if called to testify at trial. Above all, when specifically asked by the court whether the witness had previously asserted the privilege at the suppression hearing, Fagan disingenuously denied that he had done so. Only when faced with the trial judge's admonition, moments before the mistrial was declared, did Fagan display any candor about the events which transpired at the suppression hearing.

■ Moreover, Fagan knew, or should have known, that under the decisions of this Court, his alleged "good faith" belief in the invalidity of a witness' contemplated assertion of his Fifth Amendment privilege was irrelevant. In *Commonwealth v. Duval, supra,* n.6, we held:

> We disagree with those jurisdictions in which it is held that the prosecution may with impunity call before the jury a witness likely to be associated with the defendant in the minds of the jurors, knowing that a privilege against self-incrimination will be claimed and yet believing that the claim of privilege will be legally invalid. *It is a simple matter for the prosecuting attorney to inform the court that a witness he intends to call will, to his knowledge, attempt to invoke a privilege against testifying, and obtain a ruling thereon.* We note that such a procedure is proposed by the American Bar Association's Project on Standards for Criminal Justice: "A prosecutor should not call a witness who he knows will claim a privilege not to testify, for the purpose of impressing upon the jury the fact of the claim of privilege. In some instances, as

the Commonwealth's position is further underscored by the simple observation that had Romeo's testimony at trial been limited to the replies elicited at the suppression hearing, it would, in fact, have proven absolutely nothing for the Commonwealth's case.

defined in the Code of Professional Responsibility, doing so will constitute unprofessional conduct." ABA, Standards Relating to the Prosecution Function and the Defense Function § 5.7(c), at 122–23. In a comment to this section, the Project pointed out that *"if the prosecutor is informed in advance that the witness will claim a privilege and he wishes to contest the claim, the matter should be treated without the presence of the jury and a ruling obtained."* Id. at 125.

453 Pa. at 216, 307 A.2d at 234. (Emphasis supplied). On the basis of Romeo's performance at the suppression hearing alone, Fagan certainly had reason to believe that he would invoke Fifth Amendment protection at trial. Moreover, Fagan had *actual knowledge* before calling him at trial that the witness again intended to assert the privilege. By any standard, Fagan should have brought this information to the attention of the court and requested a hearing out of the presence of the jury for the purpose of obtaining specific rulings on the applicability of the Fifth Amendment privilege to each of his proposed questions.

Rather than evidencing innocent error or good faith, however, the prosecutor's actions in the proceedings below appear to have been directed precisely to avoid resolution of the Fifth Amendment questions outside of the presence of the jury. The only plausible explanation for his behavior is that the difficulty of eliciting crucial testimony, in consequence of the witness' anticipated assertion of his privilege against self-incrimination, led Fagan to attempt a maneuver designed to prejudice appellant by forcing the witness to assert the privilege in the presence of the jury.[12]

■ The record here conclusively displays an extraordinary course of prosecutorial overreaching, including direct misrepresentation to the court, taken in deliberate bad faith. This kind of intentional prosecutorial misconduct is a threat

12. As noted, Fagan brazenly responded to Romeo's counsel when informed that Romeo intended to invoke his privilege against self-incrimination if called to testify at trial, "[H]e's going to have to take it up there [pointing to the witness stand]." See n.9, *supra*.

to the very integrity of our judicial process, and must not be condoned. *Commonwealth v. Starks, supra,* n. 7. Offended as we are by such behavior on the part of any attorney, we are particularly offended when it occurs on the part of an attorney representing the Commonwealth, for, in the words of the United States Supreme Court in *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935),

> [The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law.... He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.

295 U.S. at 88, 55 S.Ct. at 633.

■ We are reluctant to mandate dismissal of charges against this or any other defendant in the absence of a completed fact finding procedure. But, extraordinary prosecutorial misconduct necessitates commensurately strong sanction. If protection against double jeopardy is to have any meaning at all, it must be invoked when an initial trial has been aborted as a result of a bad faith strategy pursued by the prosecution in a deliberate effort to prejudice the accused in the presence of the jury.[13] Thus, the Commonwealth is now precluded by constitutional restraints against double jeopardy from seeking a second opportunity to obtain a conviction of this defendant.[14]

**13.** Dismissal of charges under these circumstances will serve not only to vindicate the constitutional rights of appellant, but also to deter future deliberate prosecutorial overreaching.

**14.** *See* e. g. *United States v. Kessler,* 530 F.2d 1246 (5th Cir. 1976); *Drayton v. Hayes,* 589 F.2d 117 (2d Cir. 1979); *United States v. Mandel,* 550 F.2d 1001 (4th Cir. 1977); U.S.Const.Amend. V; *See also* Pa.Const.Art. I, § 10.

Accordingly, the order of the Court of Common Pleas is reversed and the appellant is discharged.

LARSEN, J., filed a dissenting opinion.

LARSEN, Justice, dissenting.

I dissent to the unwarranted and undesirable expansion of the narrow exception to the general rule that, where a mistrial is granted at the behest of the defendant, his reprosecution will ordinarily not be prohibited by double jeopardy considerations.

The narrow exception was engrafted in *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). The United States Supreme Court there recognized that, in certain limited circumstances, the misconduct of the prosecution might be so extreme that, even though the defendant moved for a mistrial, that fact would not prevent him from asserting the Double Jeopardy Clause of the Fifth Amendment. *Dinitz* held:

The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where 'bad faith conduct by judge or prosecutor' ... threatens the 'harassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant...." *Id.* at 611, 96 S.Ct. at 1081 (citations omitted).

The scope and breadth of the above-quoted language creating the *Dinitz* "overreaching" exception is not free from doubt. There have been at least two "reasonable" interpretations of *Dinitz* by members of this Court. *Commonwealth v. Starks*, 490 Pa. 336, 416 A.2d 498 (1980) read this *Dinitz* passage as creating two types of prosecutorial overreaching requiring the discharge of a defendant on double jeopardy grounds.[1] "First there is the prosecutorial

---

1. This author concurred in the result only in *Starks*.

misconduct which is designed to provoke a mistrial in order to secure a second, perhaps more favorable, opportunity to convict the defendant. . . . Second there is the prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant. . . ." *Id.,* 490 Pa. at 341, 416 A.2d at 500.[2] (citations omitted). This is the approach followed by the majority herein.

Justice Pomeroy took a much different approach in *Commonwealth v. Potter,* 478 Pa. 251, 386 A.2d 918 (1978). In an opinion in support of affirmance (joined by Eagen, then C.J., and O'Brien, then J.), Justice Pomeroy read *Dinitz* more restrictively. In his view, only prosecutorial misconduct *calculated* to provoke a mistrial in order to secure another, possibly more favorable, opportunity to convict the accused was misconduct of a severity sufficient to warrant the drastic remedy of discharge. In fact, this view left this Court's pre-*Dinitz* posture intact. (*See Commonwealth v. Metz,* 425 Pa. 188, 228 A.2d 729 (1967); *Commonwealth v. Warfield,* 424 Pa. 555, 227 A.2d 177 (1967); and *Commonwealth ex rel. Montgomery v. Myers,* 422 Pa. 180, 220 A.2d 859 (1966).

The majority today holds "[i]f protection against double jeopardy is to have any meaning at all, it must be invoked when an initial trial has been aborted as result of a bad faith strategy pursued by the prosecution in a deliberate effort to prejudice the accused in the presence of the jury." (At 203). This holding, it seems to me, expands even *Starks* beyond its limits, and is certainly well beyond the parameters of the exception mandated by *Dinitz.*

In the instant case, we are faced with a *single* instance of prosecutorial misconduct. The misconduct was serious and clearly warrants a new trial. I cannot, however, counte-

---

2. This approach, which recognizes two types of overreaching, discards the notion held by Justice Roberts in *Commonwealth v. Bolden,* 472 Pa. 602, 373 A.2d 90 (1977) and *Commonwealth v. Potter,* 478 Pa. 251, 386 A.2d 918 (1978) (Roberts, J., opinion in support of reversal) that "gross negligence" on the part of the prosecutor might suffice to constitute *Dinitz* overreaching. Justice Roberts authored the majority opinion in *Starks.*

nance the majority's characterization of this conduct as an "extraordinary *course* of prosecutorial overreaching." Initially, there is no suggestion that assistant district attorney Fagan intended to provoke a mistrial request (thus, under the Pomeroy-*Potter* approach, there would be no prosecutorial overreaching.) Therefore, to qualify as *Dinitz* overreaching (as interpreted by *Starks*), appellant must demonstrate that Fagan's actions constituted "prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant."

To rule that a single instance of prosecutorial misconduct, as we have here, rises to the level of bad faith/harassment type overreaching, especially in the absence of a finding of bad faith by the lower court,[3] in effect elevates all non-inadvertent prosecutorial misconduct to *Dinitz* overreaching status, since virtually *all* prosecutorial trial tactics are designed to prejudice the accused's prospects for acquittal. Every deliberate act which was later determined to be prosecutorial misconduct would thus entitle the defendant to discharge. Such a windfall (discharge) was not contemplated by the United States Supreme Court in *Dinitz* except in the most extreme situations. The Court there noted "the defendant's double jeopardy interests, however defined, do not go so far as to compel society to so mobilize its decision making resources that it will be prepared to assure the defendant a single proceeding free from harmful governmental or judicial error." 424 U.S. at 610, n.13, 96 S.Ct. at 1081, n.13; *quoting United States v. Jorn*, 400 U.S. 470, 484, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971).

In my opinion, " 'bad faith conduct by judge or prosecutor' [which] threatens the 'harassment of an accused by successive prosecutions or declarations of a mistrial' . . ." does not embrace a single instance of overzealousness on the part of a

**3.** The majority admits the fact finding procedure is incomplete. This is because the lower court, apparently applying the Pomeroy-*Potter* standard, found that Fagan had not intended to provoke a mistrial and, thus, did not consider the issue of bad faith harassment.

prosecutor unless that single instance was designed to provoke a mistrial in order to secure a more favorable opportunity to convict. I am not in complete accord with Justice Pomeroy's approach in *Potter*, however, as I can conceive of cases where the governmental machinery is used in a heavy-handed and oppressive fashion to harass and/or convict an individual without attempting to provoke a mistrial. For example, the prosecution's knowing use of false and perjured testimony would rightly cause the government to lose its opportunity for a second prosecution of that defendant based on whatever legitimate incriminating evidence remained even though the prosecution in such a case may not have been attempting to provoke a mistrial; this bad faith harassment of the defendant and the severe blow to the integrity of the judicial process would outweigh society's interest in reprosecuting the defendant. Under some conceivable circumstances, then, the "Pomeroy-*Potter*" approach would not give sufficient consideration to the interests of the accused or the integrity of the judicial process.

Conversely, the *Starks* approach, as applied in the instant proceedings, overemphasizes those interests to the disproportionate detriment of society's interests. Bad faith harassment as identified by *Dinitz* implies something more than an isolated instance of one prosecutor's indiscretion, even if deliberate. Society's desire to prevent the guilty from going unpunished will ordinarily outweigh the risk of harassment and the burdens the defendant will incur in going through a second trial. *Commonwealth v. Wright*, 439 Pa. 198, 201, 266 A.2d 651, 653 (1970). These societal interests are substantial enough to outweigh the damage done by most prosecutorial misconduct.

Prosecutors, like judges, are imperfect human beings. They can get caught up in, and carried away by, the passion of an emotional trial. Sometimes, as here, they are overzealous and they deliberately employ unprofessional, prejudicial tactics. Such tactics cannot and will not be ignored! How-

ever, the price demanded by the majority for such prosecutorial tactics is excessive. In the instant case, society loses the opportunity to prove the guilt or innocence of one who stands accused of arson and murder because of the transgression of the prosecutor, Mr. Fagan. In this case, as in most cases of prosecutorial misconduct, the unfairness to the defendant can be remedied by the grant of a new trial.

I agree with the majority that conduct such as Mr. Fagan's damages the integrity of the criminal justice system, but I cannot accept its determination that the discharge of a possible arson/murderer is necessary to restore that integrity. The integrity of the judicial process is equally tarnished by "remedies" which place total (myopic) focus on the rights of the accused while relegating the every-bit-as-important interests of society to the back seat. To safeguard the integrity of the judicial system, I would recommend, in all cases where noninadvertent prosecutorial misconduct is found, that the matter be referred to the disciplinary board for proper sanctions. The threat of disciplinary action for such misconduct would be a more direct and effective deterrent to prosecutorial misconduct than the possibility that the defendant might be discharged at some remote time following exhaustion of all appeals.

Only in the rare case where the prosecutor has deliberately acted to prompt a mistrial request (as where the case is going badly and the prosecutor contrives to get a second chance) or where the prosecution is oppressive and repugnant in its bad faith use of heavy-handed tactics (as where false evidence is knowingly used to bolster a weak case) should the drastic remedy of discharge be ordered. Only in such cases does the damage to the individual outweigh society's interests and the double jeopardy clause require the defendant's discharge. This is not such a case, because the harm to this defendant can be cured by a retrial, and is far outweighed by the societal interests in having a final adjudication of his guilt or innocence.