521 A.2d 391

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Bobby L. SIMS, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 25, 1985.

Decided Feb. 17, 1987.

Norris E. Gelman, Philadelphia, for appellant.

Robert B. Lawler, Chief/Appeals Div., Asst. Dist. Atty., Eric B. Henson, Deputy Dist. Atty., Steven J. Cooperstein, Asst. Dist. Atty., Philadelphia, Marion E. MacIntrye, Deputy Atty. Gen., Harrisburg, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.*

This is a direct appeal from a judgment imposing upon Bobby Lee Sims, the appellant herein, the sentence of death for the killing of one Warren Teasley. Sims had been tried before a jury, which, after finding him guilty of first-degree murder, voted to impose the penalty of death. The jury also found him guilty of robbery and criminal conspiracy. After the denial of post-trial motions, the appellant was given consecutive sentences of ten to twenty years' imprisonment for the robbery and five to ten years' imprisonment for the conspiracy.

On December 1, 1980, Warren Teasley was in a certain third-floor room rented to a Barry Hilton. There, on that date, Teasley was killed by being shot in the back of the head with a .45 caliber automatic pistol. His body was then taken from the room and left on the sidewalk outside the apartment building. Hilton, the occupant of the room where the shooting occurred, testified at trial as a Commonwealth witness. From his testimony we have the following account of the murder and its related events.

Hilton used the room as a place for entertaining and the taking of drugs. On the day in question, but prior to the shooting, he was in the room with a girlfriend guarding some drugs for an associate nicknamed "Breeze." About 4:00 p.m. that day the appellant, Sims, arrived accompanied

---

* This case was reassigned to this writer.

by one Alfred Dill, also known as "Dirt." The purpose of their visit was to purchase drugs. Sims asked for "Breeze"; upon being told that the person was not there, Sims stated that he and his companion would return later. When the appellant and Dill came back they had with them another man, Warren Teasley.

After Sims, Dill and Teasley had entered the room, a dispute arose between the latter two concerning money. Dill asked Teasley where certain funds were. Teasley responded by saying that he had already given him forty-five dollars. Dill repeated his demand for money, with Teasley answering that he did not have any more. Dill then pulled out a gun, pushed Teasley onto a bed, and hit him on the back of the head with the weapon.

Hilton's girlfriend became alarmed at the eruption of violence, which prompted him to escort her from the room. In the course of doing that he requested the other men to take their dispute elsewhere. When he returned Dill and Teasley were still struggling on the bed. According to Hilton, he sought to intercede in the fight but to no avail. Dill was going through Teasley's pockets, and resumed pistol-whipping him when nothing was found. Teasley again protested that he had no more money and added that they would have to kill him. At that point Sims said, "I'm tired of this; give me the gun." Dill handed the gun to Sims, who then pressed it against the back of Teasley's head and fired. Hilton departed, leaving Dill and the appellant in a discussion about what to do with the body.

Hilton returned to the site of the apartment building later that same day. Upon approaching the building he observed that the police had arrived and were in the process of drawing a chalk outline around Teasley's body, which was then lying face down on the sidewalk. Because Hilton had a criminal record which included a homicide conviction, he avoided the police. However, a trail of blood led from the body back up to Hilton's room. That fact, coupled with statements the police obtained from two residents of the

building, resulted in the issuance of a warrant for Hilton's arrest for the murder of Teasley.

About a week later Hilton surrendered to the police, whereupon he was placed under arrest and charged. He denied having any involvement in the killing. And, although he also denied even having seen the killing, he told the police that the crime was committed by two men whom he identified only as "Dirt" and "Junior." At Hilton's ensuing preliminary hearing no witnesses appeared to testify against him; consequently, the case against him was dismissed.

In the meanwhile, on January 3, 1981, Bobby Lee Sims was arrested on a charge unrelated to the murder of Teasley. However, the police found in Sims' possession at that time the gun which had been used to do the killing. A few months after that discovery, a detective newly assigned to the murder case decided to re-interview Barry Hilton. Although Hilton continued to deny that he saw the shooting, he disclosed to the police that the "Dirt" and "Junior" he had referred to earlier were actually Sims and Dill. In a subsequent police interview, held on October 3, 1981, Hilton admitted to the authorities for the very first time that he was an eye-witness to the shooting in his room. In the wake of that disclosure and other details then provided by Hilton, the police arrested appellant Sims and charged him with the murder of Warren Teasley. Hilton was granted immunity from prosecution, in return for his agreeing to testify at trial for the Commonwealth.

At the time of trial, but before the reception of any evidence, Sims' defense counsel filed a motion for leave to cross-examine witness Hilton as to what communications the latter made about the shooting to the attorney who represented him during the time he was charged with the crime. A companion motion was made requesting permission to call Hilton's former attorney as a witness to inquire of him about the same subject matter. In considering those motions the trial court was advised, outside the presence of the jury, that Hilton wished to assert the "attorney-client

privilege" as codified in section 5916 of the Judicial Code, 42 Pa.C.S. § 5916. The trial court then ruled, also outside of the jury's presence, that the privilege applied and that its assertion by the witness barred the defense from making the requested inquiries either of him or his former attorney. The court further ruled that the defense could not ask Hilton any questions even touching upon his assertion of the privilege. Thus, the trial court's rulings on the above motions not only prevented the jury from knowing what Hilton had previously told his attorney about the killing of Teasley, but also prevented the jury from even knowing that such information was being withheld by the witness.

The substance of Barry Hilton's trial testimony concerning the shooting of Teasley is reflected in this opinion's earlier recounting of the crime and its attendant circumstances. It was entirely within the jury's province to accept that testimony. *Commonwealth v. Whack*, 482 Pa. 137, 393 A.2d 417 (1978). In addition to Hilton's testimony, and the police evidence about the discovery of the murder weapon, the Commonwealth also presented the testimony of two women who stated that the appellant admitted to them that he had killed Teasley.

The appellant took the witness stand and denied having had any participation in the shooting. According to his testimony, he was not in Hilton's room on the day of the murder.

The appellant's defense, however, was not restricted to his denials of guilt and to attempts to show that prosecution witnesses were unworthy of belief. Defense counsel went further and sought to establish that Barry Hilton was the actual killer. The appellant's first effort in that regard was his explanation of why he had the murder weapon when arrested in January of 1981. He testified that he received the gun from Hilton a few days after the killing as collateral for a money loan, and that Hilton said he needed the money to leave town because of the killing. The defense also called as a witness a woman who was the mother of Hilton's child. This witness testified that Hilton had admit-

ted to her, at some point in December of 1980, that he had shot someone and needed money to go away.

Defense counsel next tried to put into evidence certain written statements which two of Hilton's neighbors, Rebecca Harris and David Carter, had given to the police within hours after the killing. Harris and Carter shared a room on the same floor as Hilton's. According to Ms. Harris' statement, Hilton had rushed into her room on the day of the murder and nervously told both her and Carter that he had just killed someone. She added that she had heard a scream just prior to Hilton's sudden visit. Harris also told the police that she later saw Hilton and another man carry a body down to the sidewalk. Carter's statement did not include all of the representations Ms. Harris had made; however, he did relate what he personally observed at the crime-scene soon after the shooting, and agreed that Hilton was extremely nervous upon entering their quarters.

Defense counsel's attempt to have the statements of Harris and Carter admitted into evidence was predicated on the fact that at the time of trial neither of those persons could be found, despite efforts by the defense and the police to locate them. That notwithstanding, the trial court ruled that the statements were inadmissible because of the hearsay rule.

Given that the jury found the appellant guilty of all charges and decided the death penalty was appropriate, the conclusion is inescapable that they accepted the testimony of the Commonwealth's witnesses and disbelieved the version of the events as urged by the defense. In his appeal to this Court, the appellant presses numerous arguments urging us to reverse the judgments of sentence and grant him a new trial.

One assertion of error is that the trial court's application of this state's "attorney-client privilege" violated the appellant's constitutional right to confront witnesses against him. As noted, Pennsylvania's version of the "attorney-client privilege," in its relation to criminal cases, is codified in 42 Pa.C.S. § 5916. That provision states as follows:

In a criminal proceeding *counsel shall not be competent or permitted to testify* to confidential communications made to him by his client, *nor shall the client be compelled to disclose* the same, unless in either case this privilege is waived upon the trial by the client. (Emphasis added.)

42 Pa.C.S. § 5916.

The privilege there stated is nothing novel in our law. Prior to the current statutory statement of it, the same privilege was set forth in section 5 of the Act of May 23, 1887, P.L. 158, 28 P.S. § 321. Indeed, the "attorney-client privilege" is so deeply rooted in our common law that it can be traced to the reign of Elizabeth I, where it was already unquestioned. *Commonwealth v. Maguigan,* 511 Pa. 112, 124, 511 A.2d 1327, 1333 (1986); 8 J. WIGMORE, EVIDENCE § 2290 (McNaughton rev. 1961). Our present statute represents a continuing legislative recognition of a highly revered and ancient common law privilege.

■ Professor Mechem, in his famous treatise on the law of agency, articulated with impressive clarity the rationale of the "attorney-client privilege." He stated that:

The purposes and necessities of the relation between a client and his attorney require, in many cases, on the part of the client, the fullest and freest disclosures to the attorney of the client's objects, motives and acts. This disclosure is made in the strictest confidence, relying upon the attorney's honor and fidelity. To permit the attorney to reveal to others what is so disclosed, would be not only a gross violation of a sacred trust upon his part, but it would utterly destroy and prevent the usefulness and benefits to be derived from professional assistance. Based upon considerations of public policy, therefore, the law wisely declares that all confidential communications and disclosures, made by a client to his legal adviser for the purpose of obtaining his professional aid or advice, shall be strictly privileged;—that the attorney shall not be permitted, without the consent of his client,—and much

less will he be compelled—to reveal or disclose communications made to him under such circumstances.

2 MECHEM, ON AGENCY § 2297 p. 1877 (2d ed. 1914). That analysis of the privilege was embraced by this Court in *Slater v. Rimar, Inc.,* 462 Pa. 138, 338 A.2d 584 (1975), and again most recently in *Commonwealth v. Maguigan, supra.* Clearly, the privilege is not concerned with the better ascertainment of truth, but rather is grounded in a policy entirely extrinsic to the fact-finding process: Its purpose is to foster a confidence between client and attorney that will lead to a trusting and open dialogue between them. *Commonwealth v. Maguigan, supra; Estate of Kofsky,* 487 Pa. 473, 409 A.2d 1358 (1979); 8 J. WIGMORE, *supra,* §§ 2196, 2291, 2324. As is reflected by the terms of 42 Pa.C.S. § 5916, the policy of the privilege applies regardless of whether disclosure is sought to be compelled from the attorney or from the client himself. *See generally* 8 J. WIGMORE, *supra,* § 2324. Significant, however, is that the privilege is designed to prevent a disclosure of the communication. The fact of the invocation of the privilege is not insulated against disclosure.

▓▓▓▓▓ Notwithstanding the foregoing, the appellant argues that the right of confrontation guaranteed by the Sixth Amendment of the United States Constitution is superior to the "attorney-client privilege" embodied in 42 Pa.C.S. § 5916. Based on that premise, he further contends that he should have been allowed to elicit from witness Hilton, or from Hilton's former attorney, the content of such communications as Hilton made to the attorney, concerning the killing of Warren Teasley, during the time when Hilton was charged with the crime. This argument must fail. In *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the Supreme Court of the United States, while holding that the right of a criminal defendant to obtain the presence of witnesses in his favor is a right of federal constitutional dimensions, was careful to point out that the right does not abrogate such testimonial privileges as "the privilege against self-incrimination or the *lawyer-client* or

husband-wife privileges" (emphasis added). *Id.* at 23 n. 21, 87 S.Ct. at 1925 n. 21. We have reached that same conclusion with regard to our state constitution. *Commonwealth v. Allen,* 501 Pa. 525, 462 A.2d 624 (1983). The import of the caveat in *Washington v. Texas, supra,* and in *Commonwealth v. Allen, supra,* is that the right of confrontation, even on its constitutional level, is qualified by the traditional testimonial privileges.

Alternative to the above constitutional challenge, the appellant also asserts that Barry Hilton should have been compelled, at the very least, to claim his "attorney-client privilege" in front of the jury. Although the appellant presents no direct authority for this proposition, it is our view that he is correct under the circumstances of this case.

This is a case in which the appellant went to trial subject to, and did receive, the death penalty. The heart of the prosecution's evidence against him was the testimony of Barry Hilton, a person in whose abode the murder was perpetrated and who, himself, was at one point charged with the crime. A principal thrust of the appellant's defense at trial was his attempt to shift criminal responsibility to witness Hilton, that is, to convince the jury that Hilton was the murderer. However, the appellant's efforts to that end were obstructed, not only by Hilton's valid assertion of a testimonial privilege, but also by the inability to obtain Rebecca Harris and David Carter as witnesses or to present their written statements as evidence. As for the Harris and Carter statements, it is clear that the trial court was correct in ruling them to be inadmissible hearsay. *Commonwealth v. Scott,* 503 Pa. 624, 470 A.2d 91 (1983).

This aspect of the issue implicates the basic right of a defendant in a criminal case to confront those witnesses who offer testimony against him. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Commonwealth v. Robinson,*

507 Pa. 522, 491 A.2d 107 (1985); *Commonwealth v. Sulli-van,* 485 Pa. 392, 402 A.2d 1019 (1979); *Commonwealth v. Cronin,* 336 Pa. 469, 9 A.2d 408 (1939); *see generally* 5 J. WIGMORE, *supra,* § 1395. Questioning Hilton as to whether he had previously made inconsistent statements with those being offered at trial in support of appellant's guilt was certainly relevant and appropriate. Forcing that witness to invoke the statutory privilege in the presence of the jury in no way undermines the underlying policy supporting that privilege. Once the privilege is recognized and upheld, the privileged communication remains inviolate. However, on the other hand, the invocation of that privilege before the jury could have reasonably provided the basis for that tribunal to question the accusations made by that witness against the accused. The very heart of cross-examination is to provide the opportunity to challenge the credibility and reliability of opposing witnesses. *Davis v. Alaska, supra.* Particularly in cases where a defendant is exposed to the most extreme penalty, the right of cross-examination must not be curtailed.

Chief Judge Bazelon in his dissent in *Bowles v. United States,* 439 F.2d 536, 543 (D.C.Cir.1970), made an observation pertinent to this inquiry:

> The differing situations of the defense and prosecution, which we have recognized in other contexts, *see, e.g., McRae v. United States,* 137 U.S.App.D.C. 80, 420 F.2d 1283 (1969), is central to an understanding of the appellant's contention. *Cf.* Goldstein, The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L.J. 1149 (1960). The position of a defendant asserting his Sixth Amendment right to bring witnesses before the jury is not analogous to that of a prosecutor attempting to insinuate that a defendant is guilty because his confederates refuse to answer incriminating questions. *See Fletcher [v. United States ], supra* [118 U.S.App.D.C. 137, 332 F.2d 724 (1964) ]. This tactic on the prosecutor's part is equivalent to an outright denial of the defendant's Fifth Amendment right to remain silent, and it is unconstitutional to employ a defendant's silence as an element

of the proof needed to convict beyond a reasonable doubt. *Fontaine v. California,* 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968); *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). *By contrast, when the accused suggests that another person is the culpable party, the other's refusal to testify is merely being used as corroboration.* (Emphasis added.) *Id.* at 545 n. 11.

We recognize the firmly established principle that the prosecution in a criminal case may not call a witness who it has reason to believe will refuse to testify on the basis of the constitutional privilege against self-incrimination. *Commonwealth v. Virtu,* 495 Pa. 59, 432 A.2d 198 (1981); *Commonwealth v. Duval,* 453 Pa. 205, 307 A.2d 229 (1973); *Commonwealth v. Terenda,* 451 Pa. 116, 301 A.2d 625 (1973). In those cases we said that such a tactic would unfairly prejudice the defendant by the innuendo of guilt by association. *E.g., Commonwealth v. Duval, supra.* That reasoning is not applicable, however, where the defendant attempts to cross-examine a witness who has been called by the Commonwealth as the principal accuser against him. To insulate such a witness from having to invoke his privilege in the jury's presence, as did the trial court in this case, unfairly bolstered the credibility of a witness whose testimony was crucial to the success of the prosecution.[1] There is nothing in the privilege or its purposes which militates against allowing the jury to at least know that a claimant of the privilege, while testifying as a witness, has elected to withhold from the jury's consideration possible previous statements made by him concerning the matter on trial. The communication itself is not revealed nor is the interest of the witness adversely affected thereby. For

---

**1.** In *Commonwealth v. Greene,* 445 Pa. 228, 285 A.2d 865 (1971), the majority opinion stated that "the jury may not draw any inference from a witness' exercise of his constitutional rights whether the inference be favorable to the prosecution *or the defense...." Id.,* 445 Pa. at 231, 285 A.2d at 867 (emphasis in original). Regardless of the wisdom of that decision (see dissent of Roberts, J.), it is not applicable to the instant case because here we are not concerned with a constitutional privilege but rather one that is of statutory origin.

these reasons we are forced to conclude that the trial judge's refusal to require Hilton to invoke the privilege in the presence of the jury was an unacceptable infringement upon appellant's right of confrontation.

Accordingly, the judgment of sentence is reversed and a new trial is awarded.

HUTCHINSON, J., joins in this opinion and files a concurring opinion.

ZAPPALA and PAPADAKOS, JJ., concur in the result.

LARSEN, J., dissents.

HUTCHINSON, Justice, concurring.

I join the opinion of the court but write separately to emphasize that the law relating to examination of witnesses and the ethics of the profession require that the cross-examiner have a sound reason for believing his questions will yield information which is materially favorable to his client before delving into areas covered by the attorney-client privilege. The policy ends fostered by the privilege, encouraging full disclosure between an attorney and his client, are ill-served by "fishing expeditions" seeking to undermine a witness's testimony through the invocation of the privilege. Counsel should have a reasonable belief that a privileged conversation relevant to the case at hand took place before cross-examination likely to force a witness to invoke the privilege is allowed. It is only because there is ample evidence on this record that counsel had the requisite information to properly question the witness that I can join the majority.

The bounds of cross-examination are properly within the sound discretion of the trial judge. *Commonwealth v. Sisco*, 484 Pa. 85, 88, 398 A.2d 955, 957 (1979). Generally, a cross-examiner must be afforded the latitude reasonably necessary to insure a fair trial. *Smith v. Illinois*, 390 U.S. 129, 132, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968); *Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931). These principles do not dictate or permit a

willy-nilly examination of witnesses subject to the confidential relationship protected by the attorney-client privilege. An attorney must have a reasonable basis which satisfies the sound discretion of the trial judge before he can be permitted to probe into confidential communications on cross-examination. Counsel's groundless pursuit of the invocation of the privilege by a witness would inflict a grave wound upon the ancient privilege guarding communications between attorney and client, a privilege which breathes life into our independent adversarial system. Therefore, I believe counsel must demonstrate, as he did in this case, a reasonable belief that a material privileged discussion took place before cross-examining a witness on communications with that witness's attorney. Of course, general law requires at least a good faith belief that the cross-examination will yield relevant information. *See, e.g., Commonwealth v. Brown,* 302 Pa. Super. 391, 448 A.2d 1097 (1982) (to impeach witness with prior inconsistent statement must be evidence that statement was made or adopted by witness whose credibility is being impeached). *See also* DR 7–106(C)(1), (2) ("In appearing in his professional capacity before a tribunal, a lawyer shall not: (1) State or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence. (2) Ask any question that he has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness or other person."). *A fortiori* where the attorney-client privilege is involved, mere subjective belief that the inquiry is relevant should not be enough. A higher standard of showing to the court a reasonable belief that the witness has material information not otherwise available seems more appropriate to me.

In the instant case, counsel for appellant Sims, Norris E. Gelman, Esquire, phoned Joel S. Moldovsky, Esquire, the attorney who had represented Hilton when Hilton was under arrest for the death of Teasley. During argument on appellant's motion to compel disclosure of the discussions between Attorney Moldovsky and Mr. Hilton, Moldovsky testified as to the contents of the phone call:

Q. Mr. Moldovsky, did you in any way reveal to Mr. Gelman the nature of the conversation or interview which you had with Mr. Hilton?

A. My answer is as follows: When Mr. Gelman called me and said I once represented Mr. Hilton, and I know Mr. Gelman. We were DA's together and I have known him over the years. So, we are not co-Counsel in any current cases or anything like that.

Said, remember your Barry Hilton case? And frankly at that point in time, the name didn't mean anything to me. But I went to my closed files, got out the Barry Hilton Case. I said, oh, yeah, sure. I said, oh, my God. Rearrest?

And he said—well, he says I have Bob Sims, Barry Sims, Robert Sims, something Sims, Simmons, whatever it was. That he told me he represents Sims or Simmons or Bob Sims or whatever it was.

And I said wait a minute. I looked through. I looked co-Defendant, looked through my whole file, said who do you represent?

And he said Sims or Simmons, whatever the name he said.

I said, I don't know anything about Simmons. He said the co-Defendant.

Thereafter, I was advised that my client was now the Commonwealth's witness. Obviously, I didn't divulge anything from my file.

But when he told me Sims or Simmons, I did look through my file, look through the police reports, look what not, and I never saw the name.

And thus I said to him, I don't want any mistake about what did or didn't go down. Look, what I said, I don't know anything about a Sims or Simmons. That's the extent of it.

N.T. Vol. 1, June 22, 1983 at 9–10.

Mr. Moldovsky did not realize the disclosure that he did not encounter the name Sims in his files led Attorney

Gelman to infer that Hilton's account of the homicide, blaming Sims, may have been a recent fabrication.[1] This disclosure gave Attorney Gelman a reasonable basis upon which to pursue this line of questioning of witness Hilton. Since Hilton's credibility was the key to the Commonwealth's case and there was no other way appellant could show that Hilton's story involving Sims was a recent fabrication, I believe the majority correctly concludes that appellant had a right to inquire into this area before the jury, leaving Hilton the option of waiving his privilege or invoking it on the stand.

1. The record reveals no evidence of deceit on the part of Mr. Gelman in soliciting the confidential information nor any intent on the part of Mr. Moldovsky to breach the attorney-client privilege. As the evidentiary privilege may only be waived by the client, there is no waiver. 42 Pa.C.S. § 5916. A punishable breach of an attorney's ethical obligation to preserve the secrets and confidences of a client requires that the disclosure be knowing. DR 4–101(B). However, counsel are reminded of the admonition of EC 4–1: "Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him."