567 A.2d 1357

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Stephen LLOYD, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 5, 1988.

Filed Oct. 19, 1989.

John W. Packel, Chief, Appeals Div., Helen A. Marino, Asst. Defender, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Norman Gross, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

McDERMOTT, Justice.

The appellant Stephen Lloyd appeals by allowance the order of the Superior Court affirming the judgment of sentence of the Common Pleas Court of Philadelphia. We reverse.

On August 2, 1985, after a four-day trial, a guilty verdict was returned against appellant on charges of rape, statutory rape, indecent assault, and corruption of minors. After denial of post-verdict motions and appellant's motion to reconsider sentence, he was sentenced to an aggregate term of imprisonment of eight and one-half to seventeen years. The judgment of sentence was timely appealed to the Superior Court, which affirmed. *Commonwealth of Pennsylvania v. Stephen Lloyd,* 367 Pa.Super. 139, 532 A.2d 828 (1987).

The record reveals that during the summer of 1983, appellant was a supervisor in a government-funded program entitled "Play Street." During this time appellant assaulted and committed various sex acts upon the six-year-old victim who participated in the program. At trial, as part of his defense, appellant alleged that the victim was delusional and/or hallucinatory. To substantiate this claim he caused a subpoena duces tecum to be issued to the Psychiatric Institute of the Medical College of Eastern Pennsylvania which rendered psychotheraputic treatment to the victim. An *in camera* inspection of the records was conducted by the trial court which determined appellant's allegations to be unfounded based upon its review of the treatment records. Appellant argues that the trial court's refusal to grant defense counsel unlimited access to these records violated his rights to confrontation and compulsory process as guaranteed by Article 1, section 9 of the Pennsylvania Constitution.[1]

1. Article 1 section 9 of the state constitution provides: In all criminal prosecutions the accused has a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment of information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty, or property, unless by the judgment of his peers or the law of the land.

The sixth amendment to Article 7 of the federal constitution provides: in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall

■ Though the constitutionality of the trial court's ruling has not previously been addressed by this Court under our state constitution, we have had occasion to rule on similar matters. For instance in *Commonwealth v. Grayson*, 466 Pa. 427, 353 A.2d 428 (1976) where the defense was denied the right to examine pre-trial statements of a prosecution witness for the purpose of cross-examination, this Court stated:

> "The defense was entitled to examine the statement in order to have a fair opportunity to cross-examine the witnesses. Whether the statements of the prosecution's witnesses would have been helpful to the defense is not a question to be determined by the prosecution or by the trial court. They would not be reading the statements with the eyes of a trial advocate engaged in defending a client. Matters contained in a witness' statement may appear innocuous to some, but have great significance to counsel viewing the statements from the perspective of an advocate for the accused about to cross-examine a witness."

*Grayson*, 466 Pa. at 429, 353 A.2d at 429.

Similarly in *Matter of Pittsburgh Action Against Rape*, 494 Pa. 15, 428 A.2d 126 (1981), this Court was called upon to determine whether or not to create an absolute privilege for all communications between rape crisis center personnel and persons seeking assistance at the center. This Court held that the rights of an individual accused of rape require that the accused be given an opportunity at least to ascertain what the complainant had previously said. The relief there was limited in that the inspection was to be conducted *in camera* and statements reflecting counselling were not to be revealed. Interpretations or recollections of the counsellor were not to be made available. Further, improper disclosure or use of the statements was prohibited. 494 Pa. at 29, 428 A.2d at 133.

have been previously ascertained by law, and to be informed of the nature and cause of the accusation: to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

We decided the issue in *Commonwealth v. Ritchie*, 509 Pa. 357, 502 A.2d 148 (1985) similarly. There the defendant was charged with rape, involuntary deviate sexual intercourse, incest and corruption of minors. During trial preparation defense counsel served a subpoena upon The Child Welfare Services (CWS) seeking records involving the complaint. CWS refused and based this refusal upon the confidentiality of the records as mandated by 11 P.S. § 2215.[2] The defendant in *Ritchie, Id.* argued that notwithstanding the confidentiality provision of the Child Protective Services law, the refusal of CWS to permit inspection of their records was a denial of his sixth amendment right to confrontation as guaranteed by the United States Constitution. We held that the defendant was entitled to gain access to the entire file of The Child Welfare Services pertaining to his daughter so that determinations concerning what information might be useful to defense might be properly made by his advocate. *Id.* We held that the Commonwealth's interest in maintaining the confidentiality of these records could not override a defendant's right to confront and cross-examine the witnesses against him. The United States Supreme Court reversed our holding in part in *Pennsylvania v. Ritchie, affirmed in part, reversed in part*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

Our decision in *Ritchie, supra* was based upon our view of how the United States Supreme Court would balance a defendant's sixth amendment right to confrontation under the federal constitution against a victim's competing statutorily protected right to maintain the confidentiality of records of assault in the possession of the state. The issue currently before this Court arises not under the federal constitution but rather under our State Constitution and does not involve a request to discover statutorily protected state maintained records but rather a request to produce Psychotherapy records in the possession of a hospital where treatment was administered.

2. Act of November 26, 1975, P.L. 438, No. 124 §§ 1–26, 11 P.S. section 2201, *et seq.*

While the minimum federal constitutional guarantees are equally applicable to the analogous state constitutional provisions, the state has the power to provide broader standards than those mandated by the federal constitution. *Commonwealth v. Sell*, 504 Pa. 46, 63, 470 A.2d 457 (1983). *See also Prune–Yard Shopping Center v. Robins*, 447 U.S. 74, 80–82, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d 741 (1980), *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967). Appellant would require that we not only apply our holding in *Ritchie* to the facts of his case but that we extend it to hold that the confrontation and compulsory process clause of the Pennsylvania Constitution require that appellant's counsel be given access to the victim's entire psychotheraputic record.

In *Ritchie* we determined that the defendant was denied his sixth amendment right to confrontation under the federal constitution when his attorney was denied total access to The Child Welfare Service records. We now hold under the confrontation clause of the Pennsylvania Constitution, that the appellant in the instant action was denied his right to confrontation when his attorney was denied access to the contents of the victim's psychotheraputic records. In addition we hold that the right to inspect these records is also mandated by the compulsory process clause of the Pennsylvania Constitution. Our reasoning in this regard is guided by this Court's decision in *Commonwealth v. Smith*, 417 Pa. 321, 208 A.2d 219 (1965). In Smith the issue was whether the defendant had the right to inspect certain witness statements in the possession of the Federal Bureau of Investigation. While discussing the appellant's right to access this information, Justice Musmanno writing for the majority stated, "Smith had the right to, and great need for, the statements he requested. The 6th Amendment to the Constitution of the United States guarantees to the accused the right to have compulsory process for obtaining witnesses in his favor and to have the assistance of Counsel for his defense." *Smith*, 417 Pa. at 329, 208 A.2d at 223. Though

the issue in *Smith* was resolved under the United States Constitution, it is clear that the Court intended to afford similar protection under the Pennsylvania Constitution when it said, "Of course, Article 1, section 9 of the Pennsylvania Constitution is equally applicable." *Smith*, 417 Pa. at 329 n. 2, 208 A.2d at 223 n. 1a.

■ We now turn to the Commonwealth's argument that the appellant waived his right to review the statement of the complainant as contained in the record of her psychiatric treatment. We note that *appellee* initially attempted to gain access to all of the victim's records. The Commonwealth argues that appellant has waived the right to inspect any statements contained therein as a request to inspect specific statements was not made. This argument is devoid of merit for logic dictates that appellant's request to view the entire record would naturally encompass the right to view any statements made by the victim. Further, by not having knowledge of the contents of these records he would not be expected to describe with particularity the specific statements which were the subject of the report.

We hold therefore that appellant's counsel is entitled to see these hospital records in an *in camera* proceeding to insure their confidentiality. The trial court may issue such orders as will protect that confidentiality.

Accordingly, we reverse and order a new trial.

STOUT, Former Justice, did not participate in the decision of this case.

LARSEN, J., files a dissenting opinion in which PAPADAKOS, J., joins.

LARSEN, Justice, dissenting.

In this tragic case, a six year old child was repeatedly raped, sodomized and otherwise sexually assaulted, her physical and personal integrity violated, her privacy invaded and shattered, by thirty-four year old Stephen Lloyd, who was the child's supervisor at the "Play Street" child care program and a "trusted friend" of her family. The majori-

ty of this Court now continues the assault upon this young rape victim's personal integrity, assists in the further invasion of her privacy, and quite possibly retards her treatment by permitting her attacker virtually unlimited access to all medical records generated by the psychotherapeutic treatment which she has received in an effort to deal with and hopefully overcome the emotional and psychological damages inflicted by Mr. Lloyd. Thus does the criminal "justice" system become an active accomplice in the violation of another rape victim.

With precious little constitutional analysis, the majority holds "under the confrontation clause of the Pennsylvania Constitution, that the appellant [Mr. Lloyd] ... was denied his right to confrontation when his attorney was denied access to the contents of the victim's psychotherapeutic records ...," and "that the right to inspect these records is also mandated by the compulsory process clause of the Pennsylvania Constitution." Majority op. at 434. This holding is not constitutionally compelled by either the confrontation clause or the compulsory process clause or, for that matter, by due process. In my view, the medical records pertaining to the child victim's psychotherapeutic treatment are protected from disclosure by various recognized testimonial privileges which are not outweighed by the appellant's purported need for or limited right to such information in the hands of a non-adversary third party. Indeed, the majority opinion is stone silent on and does not even mention the various privileges that are relevant and operative in this case, namely the patient-psychologist privilege,[1] the patient-psychotherapist privilege,[2] the sexual assault counselor privilege,[3] and the patient-physician privi-

---

1. 42 Pa.C.S.A. § 5944

2. *See, e.g., In re B.,* 482 Pa. 471, 394 A.2d 419 (1978) (Manderino, J., Opinion Announcing the Judgment of the Court) *and Matter of Pittsburgh Action Against Rape,* 494 Pa. 15, 24 n. 2 and 29, 428 A.2d 126 (1981) (recognizing the existence of a patient-psychotherapist testimonial privilege, although majority declined to extend this privilege to the client-rape crisis counselor relationship as this writer would have done).

3. 42 Pa.C.S.A. § 5945.1.

lege.[4]

I have considered appellant's request for the psychotherapeutic treatment records of the Psychiatric Institute of the Medical College of Eastern Pennsylvania in light of these various testimonial privileges, and I conclude without hesitation that the appellant has failed to meet his burden of overcoming these privileges by a showing of particularized need for the information sufficient to outweigh society's and the victim's interests in maintaining the confidentiality of the communications generated within the psychotherapeutic relationship. Accordingly I dissent most sadly, most vigorously and apologetically to this victim and her family, and I would affirm the orders and decisions of the trial and Superior Courts.

Shortly after the child victim in this case disclosed that appellant was her attacker, she began weekly psychotherapy sessions with Dr. Clifford, a psychiatrist at the Psychiatric Institute of the Medical College of Eastern Pennsylvania. Notes of Testimony (N.T.) at 71–72, 80, July 31, 1985. These weekly psychotherapy sessions with her psychiatrist continued from November 1983 up to and including the time of trial in July/August 1985. *Id.*

After the victim's mother testified briefly at trial that her daughter had been under the care of a psychiatrist, defense counsel requested a subpoena duces tecum for the medical records of the Psychiatric Institute pertaining to the victim's psychotherapeutic treatment. Counsel's request was predicated on his assertion that "his investigation revealed that [the victim] had been diagnosed as being delusional and hallucinating." N.T., August 2, 1985 at 89.

The court, the Honorable Ricardo C. Jackson presiding, ordered production of said records, and examined them fully *in camera,* concluding that "nowhere in the record did it show or did it say she was delusional or hallucinating." *Id.* at 90. Defense counsel objected to this procedure and requested that he be allowed to examine the medical

---

**4.** 42 Pa.C.S.A. § 5929 *and In re June 1979 Allegheny County Investigating Grand Jury,* 490 Pa. 143, 415 A.2d 73 (1980).

records to determine if the victim was delusional or hallucinating. *Id.* The court refused, informing defense counsel that the court had "reviewed those records from the very first line of those records to the very end" and found no suggestion that anyone at the Institute found the child delusional or hallucinating. *Id.* at 90–91.

Defense counsel then suggested other reasons why he should be allowed to examine the records himself. *Id.* at 92. Those other reasons were to determine whether the victim had made similar "accusations against other people," to learn "why was she treated, what was she being treated for, and what was her diagnosis," to discover what kind of medication she might have been on, and to learn whether she had been encouraged by her mother to make accusations against appellant. *Id.* at 92–97. The court informed counsel that the records showed the purpose of the victim's treatment was because she had been traumatized because appellant had sexual intercourse with her, that there was nothing in those records indicating that anyone else had had sex with her or that she had accused anyone else of having sex with her, that the medication prescribed was irrelevant and that there was nothing in the record to suggest that the victim had been influenced by her mother to accuse appellant of rape. *Id.*

Accordingly, the court denied defense counsel's request for access to the Psychiatric Institute's medical records. Counsel then moved for a mistrial which was denied. In his post-trial motions, appellant claimed that the court "denied his constitutional right to call and confront witnesses and to present a defense" by prohibiting him from inspecting the medical records and also by ruling that the witness from the Psychiatric Institute (Dr. Leaffy Pollack, also a psychiatrist) would not be compelled to testify. Appellant contended only that said records "would have shown (a) the complainant was delusional, and (b) had named others as committing the crime ..." Post-trial "Statement of Matters Complained of On Appeal," par. 1.

Post-trial motions were denied and, on appeal, a panel of the Superior Court upheld the trial court's refusal to allow defense counsel access to the medical records pertaining to the victim's psychotherapeutic treatment. This Court now, without legal justification, reverses the Superior Court and holds "that Appellant's counsel is entitled to see these hospital records in an in camera proceeding to insure their confidentiality. The trial court may issue such orders as will protect that confidentiality." Op. at 1359.[5]

Article I, section 9 of this Commonwealth's Constitution provides, *inter alia,* that in all criminal prosecutions, an accused has the right "to meet the witnesses face to face" and the right "to have compulsory process for obtaining witnesses in his favor." These rights are not absolute, unlimited rights to discover any and all pieces of information existing anywhere in the world, and are of course subject to the normal evidentiary admissibility rules such as relevancy, materiality and competency, and are subject as well to traditional testimonial privileges against compelled disclosure of protected and/or confidential communications.

As this Court stated in *Commonwealth v. Jackson,* 457 Pa. 237, 240, 324 A.2d 350 (1974), the right to compulsory process guaranteed by Article I, section 9 of the Pennsylvania Constitution and the Sixth Amendment to the United States Constitution "though fundamental, is not however, absolute. *Evidentiary rules based on legitimate state interests which exclude certain witnesses or certain testimony are not inconsistent nor incompatible with the right to compulsory process."* The same is true with regard to the state and federal constitutional right to confront and cross-examine witnesses contained within those same clauses, i.e., this right *"even on its constitutional level, is qualified by the traditional testimonial privi-*

5. It will be of little consolation to this rape victim and others in her position to know that their attackers will *only* be allowed to examine their most intimate and personal, private confidential communications to their psychotherapists in a judge's chambers. The confidentiality of the psychotherapeutic relationship is breached the moment defense counsel opens the file, regardless of whether this is done in chambers or on a public thoroughfare.

leges." *Commonwealth v. Sims*, 513 Pa. 366, 375, 521 A.2d 391 (1987), *citing Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). *See e.g., Commonwealth v. McCloud*, 457 Pa. 310, 312, 322 A.2d 653 (1974) (hearsay evidence admissible against defendant in some circumstances over a claim that such admission would violate his right of confrontation and cross-examination); *Commonwealth v. Allen*, 501 Pa. 525, 462 A.2d 624 (1983) (right of compulsory process is qualified to extent of existing testimonial privileges, including privilege against self-incrimination); *Commonwealth v. Sims, supra* (right of confrontation is qualified to extent of existing testimonial privileges, including attorney-client privilege which protect against compelled disclosure of confidential communications made by client to attorney).

This Court's recent experience in *Commonwealth v. Ritchie*, 509 Pa. 357, 502 A.2d 148 (1985), is illustrative of the constitutional principal that a defendant's right to confront and cross-examine witnesses and to compulsory process is not absolute and must at times yield to legitimate testimonial privileges. In *Ritchie*, the defendant had repeatedly raped and otherwise sexually assaulted his twelve year old daughter. Defense counsel subpoenaed Child Welfare Services (CWS) to produce records pertaining to the child victim based on the flimsy assertion that there *might* be something that *could be* helpful to the defense in that case. Despite explicitly mandated statutory confidentiality of these records under the circumstances, a majority of this Court, over this writer's vigorous dissent (joined by former Justice Hutchinson), allowed the defendant unlimited access to the CWS files because, in the majority's view, the confrontation and compulsory process clauses of the Sixth Amendment to the Constitution of the United States required virtually unlimited disclosure of such files whenever a defendant merely asked for them, regardless of the confidential, privileged nature of the information sought or the fact that the information was in the hands of a neutral

third party and not used by or in the possession of the Commonwealth.

In *Ritchie,* I dissented pointing out that under both our federal and state constitutions, the rights to confrontation and to compulsory process have never been held to be unlimited rights of discovery and have always been qualified by testimonial privileges stemming from constitutional, common law and statutory sources. 509 Pa. at 373–75, 502 A.2d at 157. Speaking specifically of the Sixth Amendment rights to confront witnesses and to have compulsory process (although equally applicable under the Pennsylvania Constitution), I noted that a defendant's legitimate claim of entitlement to access to evidence/information must be carefully balanced against a legitimate claim that such evidence/information is privileged against compelled disclosure. *Id.* at 373–75, 502 A.2d at 157, (*and see* cases cited therein). Balancing the competing interests in *Ritchie,* I would have held that the CWS files would remain confidential and would have denied defense access to said files, particularly in light of Ritchie's totally general, vague and uncompelling assertion of his "need" to see said files.

On the Commonwealth's appeal by certiorari to the United States Supreme Court, that Court affirmed in part and reversed in part. *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). Four members of the Court, in an opinion by Justice Powell, held that the confrontation clause of the Sixth Amendment did not require compelled disclosure of CWS's files and that the majority of this Court erred in ruling to the contrary. The plurality further held that the due process clause, not the compulsory process clause, provided the proper framework under the circumstances for determining whether a defendant is entitled to information in possession of a third party upon request by an accused. Applying due process principles, the plurality held that disclosure might be required because this "is not a case where a state statute grants [CWS] the absolute authority to shield its files from all eyes. *Cf.* 42 Pa. Cons.Stat. § 5945.1(b) (1982) (unqualified statutory priv-

ilege for communications between sexual assault counselors and victims)." 480 U.S. at 57, 107 S.Ct. at 1002. Because the statutory privilege against compelled disclosure was qualified by the legislature, the plurality affirmed this Court's remand for further proceedings, but limited defense access to the CWS file. The Court held it would be sufficient for the trial court to inspect the file to determine whether it contained information that probably would have changed the outcome of the trial. If yes, Ritchie was to receive a new trial. If no, or if yes but nondisclosure was harmless error, the lower court was free to reinstate the conviction.

Justice Blackmun concurred in part and concurred in the judgment. While Justice Blackmun would have held that the confrontation clause was applicable, he nevertheless agreed that the plurality's remand to allow the trial court to inspect the records was sufficient to protect Ritchie's rights and interests under that clause.

The plurality opinion rendered additional guidance regarding the scope of a defendant's right to discovery in rejecting this Court's majority view "that whenever a defendant alleges that protected material might be material, the appropriate method of assessing this claim is to grant full access to the disputed information, regardless of the State's interest in confidentiality." 480 U.S. at 59, 107 S.Ct. at 1002–03. A defendant's right to discover exculpatory information does not include the unsupervised authority to search the Commonwealth's files, nor does it allow the defendant to conduct his own search of all files not in the Commonwealth's possession that might possibly be relevant. The Court then offered the following analysis which is enlightening to our determination in the instant case:

> To allow full disclosure to defense counsel in this type of case would sacrifice unnecessarily the Commonwealth's compelling interest in protecting its child abuse information. *If the [CWS] records were made available to defendants, even through counsel, it could have a seriously adverse effect on Pennsylvania's efforts to*

*uncover and treat abuse.* Child abuse is one of the most difficult crimes to detect and prosecute, in large part because there often are no witnesses except the victim. A child's feelings of vulnerability and guilt, and his or her unwillingness to come forward are particularly acute when the abuser is a parent. It therefore is essential that the child have a state-designated person to whom he may turn, and to do so with the assurance of confidentiality. Relatives and neighbors who suspect abuse also will be more willing to come forward if they know that their identities will be protected. Recognizing this, the Commonwealth—like all other States—has made a commendable effort to assure victims and witnesses that they may speak to the [CWS] counselors without fear of general disclosure. *The Commonwealth's purpose would be frustrated if this confidential material had to be disclosed upon demand to a defendant* charged with criminal child abuse, simply because a trial court may not recognize exculpatory evidence. *Neither precedent nor common sense requires such a result.*

480 U.S. at 60–61, 107 S.Ct. at 1003–04 (emphasis added).

In the instant case, several recognized testimonial privileges are or may be operative.

Privileged communications take various forms and are protected from disclosure for different reasons of social policy. They may be classed into three categories: (1) those designed to protect the individual, often the accused (*e.g.,* the privilege against self-incrimination or against having otherwise illegally-obtained evidence admitted); (2) those designed to protect the integrity of some system of government (*e.g.,* "executive privilege"); and (3) those designed to encourage freedom from fear of disclosure in persons partaking of certain relationships, the functions of which are deemed extremely important to society and which are dependent for their effectiveness on full mutual disclosure between the parties to the relationship (*e.g.,* attorney/client, priest/penitent, physician/patient). Fisher, *The Psychotherapeutic Professions and the law of*

*Privileged Communications,* 10 Wayne L.Rev. 609, 610 (1964) (hereinafter *Fisher*); see also McCormick, *The Scope of Privilege in the law of Evidence,* 16 Texas L.Rev. 447 (1938) (hereinafter *McCormick*).

\* \* \* \* \* \*

While there have been a variety of historical justifications for many of the privileges in the third class, it is generally conceded today that the sole justification for such privileges is that the social utility of the particular relationship is so great that it outweighs society's interest in having all possible evidence disclosed in the litigation, Comment, *The Social Worker–Client Relationship and Privileged Communications,* 1965 Wash.U.L.Q. 362, 365 (hereinafter *Social Worker–Client Privilege*), and that the relationship depends for its existence upon strict confidentiality between the parties. 8 J. Wigmore, *Evidence* § 2291 at 549–53 (McNaughton rev. 1961) (hereinafter *Wigmore*).

> At present, there is one, and only one, justification—that the relationship is rendered ineffective either because a person is deterred from entering into it or because the person is frightened into non-disclosure during its course, and, that the effect of such an absence of the privilege is undesirable in light of the importance of the relationship to society. *Fisher, supra* at 611.

*PAAR, supra* at 494 Pa. 36–37, 428 A.2d at 136–37. (Larsen, J., dissenting).

These testimonial privileges are not concerned with the better ascertainment of the truth, but rather are grounded upon policy considerations entirely extrinsic to the truth-determining process. *Commonwealth v. Maguigan,* 511 Pa. 112, 125, 511 A.2d 1327, 1334 (1986), *citing Estate of Kofsky,* 487 Pa. 473, 409 A.2d 1358 (1979). Moreover, to preserve the sanctity of the confidences and integrity of the social relationships that "third class" testimonal privileges are designed to encourage, the burden of proof is on the party seeking to overcome a legitimate testimonial privilege

and compel disclosure of confidential communications arising therein. *Commonwealth v. Maguigan,* (*and see* cases cited therein).

With these general principles in mind, I turn to the specific testimonial privileges that are applicable in this case to protect and preserve the confidential communications between the child victim and her psychiatrists/psychotherapists at the Psychiatric Institute.

*Patient–Psychologist Privilege*

In Pennsylvania, there is an unqualified privilege for nondisclosure of confidential communications between a licensed psychologist and a client. 42 Pa.C.S.A. § 5944 provides:

> **Confidential communications to licensed psychologists**
>
> No person who has been licensed under the act of March 23, 1972 (P.L. 136, No. 52), to practice psychology shall be, without the written consent of his client, examined in any civil or criminal matter as to any information acquired in the course of his professional services in behalf of such client. The confidential relations and communications between a psychologist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client.

Our Superior Court has recently had the opportunity to consider this privilege against a sexual assault defendant's claim that he was entitled by the confrontation clause of the Sixth Amendment to inspect the files of the rape victim's psychologist who treated the victim following her attack. *Commonwealth v. Kyle,* 367 Pa.Super. 484, 533 A.2d 120 (1987), allocatur denied, 518 Pa. 617, 541 A.2d 744 (1988). In an excellent opinion by Judge Olszewski (for a panel including himself, President Judge Cirillo and Judge Hester), the Superior Court affirmed the trial court's ruling that the psychologist's files were absolutely privileged communications pursuant to 42 Pa.C.S.A. § 5944, and that the need for confidentiality was so great that not only was the

defendant denied access to said files but also they were not even subject to in camera inspection by the trial court.

I will not repeat the bulk of this thoughtful and thorough Superior Court opinion (which analyzed and reviewed *Pennsylvania v. Ritchie, supra*), although I urge the reader to review it in its entirety. I will, however, reprint some of its salient reasoning in support of an absolute privilege for confidential communications between a psychologist and her or his patient:

Like the attorney-client privilege, the psychologist client privilege protects an interest extrinsic from the truth-finding process. The rationale for the psychologist-client privilege was cogently stated in an Advisory Committee Note to Proposed Federal Rule of Evidence 504:

Among physicians, *the psychiatrist, has a special need to maintain confidentiality.* His capacity to help his patients is completely dependent upon their willingness and ability to talk freely. This makes it difficult if not impossible for him to function without being able to assure his patients of confidentiality and, indeed, privileged communication. Where there may be exceptions to this general rule ..., *there is wide agreement that confidentiality is a sine qua non for successful psychiatric treatment.* The relationship may well be likened to that of the priest-penitent or the lawyer-client. Psychiatrists not only explore the very depths of their patients' conscious, but their unconscious feelings and attitudes as well. *Therapeutic effectiveness necessitates going beyond a patient's awareness and, in order to do this, it must be possible to communicate freely. A threat to secrecy blocks successful treatment.*

Report No. 45, Group for the Advancement of Psychiatry 92 (1960), *quoted in* Advisory Committee's Notes to Proposed Rules, 56 F.R.D. at 242. Similarly, the District of Columbia Circuit Court explained in an oft-quoted statement:

The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition ... *It would be too much to expect them to do so if they knew that all they say—and all that the psychiatrist learns from what they say—may be revealed to the whole world from a witness stand.*

*Taylor v. United States,* 222 F.2d 398, 401 (D.C.Cir.1955) ... (further citation omitted).

As these comments indicate, patient confidence is essential for effective treatment. Because the information revealed by the patient is extremely personal, the threat of disclosure to outsiders may cause the patient to hesitate or even refrain from seeking treatment. The privilege thus serves the public interest in promoting a society in which the general well-being of the citizenry is protected. *We find that this public interest is especially compelling where, as here, the victim of a crime has sought post-assault treatment knowing that her testimony would be a necessary part of the prosecution's case....*

The statutory privilege for psychologists and clients also serves to protect another interest as well: *the privacy interest of the client.* Given the extremely personal nature of the information passed and the confidential relationship in which the information was shared, compelled disclosure in court would make public the client's innermost thoughts. This privacy interest is not without significance. Indeed, it has been suggested that the privacy interest of the client may have constitutional underpinnings. In *In re B.,* 482 Pa. 471, 394 A.2d 419 (1978), a plurality of the Pennsylvania Supreme Court concluded that a client's interest in keeping confidential psychotherapeutic communications was a constitutionally

protected interest. *In re B.*, 482 Pa. at 484, 394 A.2d at 425. . *See Commonwealth ex rel. Gorto v. Gorto*, 298 Pa.Super. 509, 513, 444 A.2d 1299, 1301 (1982) (in accord with *In re B.*, access to records of patient's psychiatric history was an impermissible invasion of privacy).... (further citations and references omitted).

\* \* \* \* \* \*

We have no doubt that the public interest in protecting a client's privacy interest under such circumstances is particularly important. Whether or not that privacy interest is constitutionally protected, it is still desireable as a matter of social policy to recognize and protect this interest as it is reflected in the statutory psychologist-client privilege.

367 Pa.Super. at 495–500, 533 A.2d at 126–28 (emphasis added). I would adopt the Superior Court's reasoning and holding in *Kyle*.

*Patient–Psychotherapist Privilege*

As the Superior Court noted in *Kyle*, this Court has recognized a patient-psychotherapist privilege against compelled disclosure of confidential communications based in part upon the constitutionally founded right of privacy. In *In re B.*, 482 Pa. 471, 484–85, 394 A.2d 419 (1978), Justice Manderino, speaking for the plurality stated:

We conclude that in Pennsylvania, an individual's interest in preventing the disclosure of information revealed in the context of a psychotherapist-patient relationship has deeper roots than the Pennsylvania doctor-patient privilege statute, and that the patient's right to prevent disclosure of such information is constitutionally based. This constitutional foundation emanates from the penumbras of the various guarantees of the Bill of Rights, ... as well as from the guarantess of the Constitution of this Commonwealth ... (numerous references to specific constitutional provisions omitted.)

The nature of the psychotherapeutic process is such that disclosure to the therapist of the patient's most

intimate emotions, fear, and fantasies is required. As pointed out in appellant's brief,

"People usually enter psychotherapy because they have deep-seated conflicts and impairment of functioning which limit their ability to work effectively and to enjoy fully satisfying relationships with other people. To alleviate these blocks and conflicts, the therapist asks the patient to abandon 'rational thought' and to express thoughts and fears that may never have been revealed to anyone else. Indeed, these innermost thoughts are often so painful, embarrassing or shameful that the patient may never before have allowed himself to acknowledge them."

The patient in psychotherapy knows that such revelations will be expected if the process is to be beneficial. *In laying bare one's entire self, however, the patient rightfully expects that such revelations will remain a matter of confidentiality exclusively between patient and therapist.* (Citations omitted.)

In *PAAR, supra,* a majority of the Court recognized the "psychotherapeutic privilege" against compelled disclosure of confidential communications between psychotherapist and patient, although the majority declined to extend that protection to communications generated between rape crisis center counselors and rape victims. 494 Pa. at 24, n. 2 and 29, 428 A.2d at 130, n. 2 and 132.

From all of the foregoing, it is clear that this Commonwealth should and does recognize a common law privilege arising from the patient-psychotherapist relationship, and that this right has constitutional underpinnings in the patient's right to privacy. The psychotherapist in the instant case, so far as the record reveals, is a psychiatrist, a medical physician with training and expertise at least on par with, and usually more extensive than, that of the licensed psychologist. The need for confidentiality and privacy in the psychotherapeutic setting is apparent whether the psychotherapist is a psychologist, a psychiatrist or some other equally accepted and valid psychotherapeutic counselor. *See, e.g., PAAR, supra,* 494 Pa. at 49–55, 428 A.2d at 146

(Larsen, J., dissenting) ("Virtually every school of psychotherapy recognizes confidentiality as the *sine qua non* of effective therapy. . . . It is the therapeutic *function* that the psychotherapeutic privilege is designed to protect—not a particular group of individuals.")

*Victim–Sexual Assault Counselor Privilege*

As previously discussed, this Court refused to expand the patient-psychotherapist privilege to cover the confidential communications between a rape victim and her counselor at a rape crisis center. *PAAR, supra.* I would have recognized such a privilege because I believe "confidentiality is essential to the rape victim/rape crisis counselor relationship—both to encourage victims to seek treatment which they might otherwise avoid and to facilitate realization of the maximum therapeutic benefit from that relationship." 494 Pa. at 57–58, 428 A.2d at 147 (Larsen, J., dissenting).

In *PAAR,* I urged the legislature to enact a rape victim/rape crisis counselor testimonial privilege. Shortly thereafter, on December 23, 1981, our legislature did indeed legislatively create an unqualified testimonial privilege against compelled disclosure of confidential communications made by a victim to sexual assault counselors. 42 Pa.C. S.A. § 5945.1(b).

*Patient–Physician Privilege*

A statutory patient-physician privilege exists in civil matters. Substantially reenacting an act of 1907, section 5929 of the Judicial Code provides as follows:

**Physicians not to disclose information**

No physician shall be allowed, in any civil matter, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil matters brought by such patient, for damages on account of personal injuries.

42 Pa.C.S.A. § 5929.

On its face, this patient-physician privilege is applicable only in civil matters. However, this Court has held that a

patient-physician privilege exists as well in criminal proceedings and that such privilege has its source in the constitutionally created right of privacy. As then Chief Justice Eagen stated for the plurality (joined by Justices O'Brien and Kauffman) in *In re June 1979 Allegheny County Investigating Grand Jury*, 490 Pa. 143, 415 A.2d 73 (1980):

Based on Mr. Justice Manderino's opinion in *In re: B., supra*, the administrator asserts the physician-patient privilege is broader than the statutory provision, being rooted in the right to privacy guaranteed by both the United States Constitution and the Pennsylvania Constitution. While its sources and limits may be disputed, there can be no doubt that the United States Constitution guarantees a right to privacy.... Cases concerned with the constitutional protection of privacy "have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." ...

Clearly, *the privacy interest of the patients which is implicated under the instant set of facts is the interest in avoiding disclosure of personal matters. This privacy interest finds explicit protection in the Pennsylvania Constitution, Art. 1 § 1,* which provides, in pertinent part: "All men ... have certain inherent and indefeasible rights, among which are those ... of acquiring, possessing, and protecting property and reputation...." Disclosure of confidences made by a patient to a physician, or even of medical data concerning the individual patient could, under certain circumstances, pose such a serious threat to a patient's right not to have personal matters revealed that it would be impermissible under either the United States Constitution or the Pennsylvania Constitution. However, such circumstances do not exist in this case.

490 Pa. at 150–51, 415 A.2d at 77–78 (citations omitted; emphasis added).

However, the plurality found no violation of the patients' right to privacy and/or the patient-physician privilege in *1979 Grand Jury* because of two factors: namely (1) the factual and non-confidential, non-communicative nature of the information that was subpoenaed by the Grand Jury (reports analyzing tissue samples); and (2) the confidentiality and secrecy of the grand jury proceedings.

Both this writer and Justice Flaherty, in separate dissents, agreed with the plurality that there is a federal and state constitutionally based right of privacy which protects and privileges confidential communications arising within the patient-physician relationship. We in the dissent, however, felt that these rights of privacy were in fact violated by compelled disclosure to the grand jury whether or not those proceedings were theoretically "secret," and we believed the information sought qualified as confidential communications.

At any rate, five members of this Court agreed that a privilege exists, based upon the right of privacy, which protects confidential communications arising within the patient-physician relationship against compelled disclosure in criminal proceedings. A psychiatrist is a physician, and a relationship between patient and psychiatrist is clearly protected by the patient-physician privilege.

## Application of Various Privileges

In the instant case, we are not certain of the exact contents of the medical records which defense counsel seeks access to. We do not know whether they contain files/records of the child victim's counseling with any licensed staff psychologist, or what other psychotherapists were treating her. We do not know whether the Psychiatric Institute would qualify as a "rape crisis center" within the meaning of 42 Pa.C.S.A. § 5945.1, or whether her counselors included "sexual assault counselors." We do know that the records of the Psychiatric Institute were presented by a psychiatrist and that the victim's treatment began on a weekly basis with a psychiatrist. We also know that the records were generated entirely by the victim's

long-term and continuing (at least until the time of trial) psychotherapy which was necessitated by the repeated sexual assaults perpetrated upon her by her "trusted friend" and child care center supervisor, Stephen Lloyd.

When such a devastating and overwhelming bodily and psychological invasion is forced upon a young child, particularly where the invader is a trusted adult in a position of authority over the victim, it cannot help but inflict deep psychological and emotional wounds and scars to accompany the physical invasion and injuries.[6] Experience has shown us that a victim who suffers such atrocities at such a formative stage of development by a trusted adult in a position of authority over the victim will experience severe and lasting damage to her or his psyche. For our daughters and sons who have been so victimized, overcoming such emotional and psychological trauma could be achieved, if at all, only through long term psychotherapeutic treatment by competent mental health care professionals operating in an atmosphere and relationship with the victim of absolute and complete confidence, privacy and trust.

Undoubtedly, the child victim, her guardians and the mental health care professionals/psychotherapists administering psychotherapeutic treatment operated on the assumption that the rape victim/patient-psychotherapist relationship(s) would remain inviolate and that all confidential communications made within this/these relationship(s) would be privileged, would remain absolutely confidential and would be protected by law. Sadly, the majority of this Court now destroys that assumption as easily as Stephen Lloyd destroyed the child's life by permitting her attacker (through his attorney) to continue the invasion of her privacy and to violate her integrity by rummaging through all of

6. The physical injuries in this case included the passing of venereal disease from appellant to his six year old victim. 367 Pa.Super. at 143–45, 532 A.2d at 830–31. As horrible as it is to have venereal disease thrust upon her at her tender age, it will quite likely be easier for the medical profession to treat her physical damage than to minister to her emotional and psychological injuries.

the files and records generated by her psychotherapeutic treatment, without restriction.

Worse yet, the majority rushes to its result without even acknowledging the Commonwealth's substantial arguments that the medical records involved are privileged against compelled disclosure—not one word of recognition is given to the various testimonial privileges discussed above, or to the settled principle that an accused's right to confrontation and compulsory process is qualified by legitimate testimonial privileges. Obviously, then, there was not even the pretext of *balancing* the right of the accused against the needs and interests of the victim and of society as expressed in and protected (until now) by these various recognized and accepted privileges. Moreover, the several cases of this Court offered by the majority in support of this sweeping new constitutional right are wholly nonsupporting and unsatisfactory.

The majority discusses, by way of historical background, several "similar matters," the first of these being *Commonwealth v. Grayson*, 466 Pa. 427, 353 A.2d 428 (1976). The only "similarity" is that the defendant in *Grayson* also sought access to information. However, the information sought in *Grayson* was classic "Jencks" material, i.e. prior pretrial statements of prosecution witnesses given to prosecution investigators and in the possession of the Commonwealth. *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). The Commonwealth is under a continuing obligation to make available to a defendant, upon request, exculpatory evidence which it has in its possession. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The instant case did not involve a request for prior statements of a prosecution witness in the possession of the Commonwealth, and *Grayson* therefore offers no support for the majority's novel rule of discovery.

The majority next mentions *PAAR* in passing as a "similar case" guiding its decision. I have already discussed *PAAR* and my views expressed in dissent therein. For present purposes, suffice it to say that the majority in

*PAAR* was also concerned with a request for "Jencks" material (prior statements of the prosecution witness), and granted only very restricted access to defense counsel to discover such material; the trial court was to initially inspect the records of the rape crisis center and was to allow defense counsel to inspect *only* verbatim statements of the prosecution witness. Defense counsel was denied access to all material dealing with counseling only.

The majority next offers a brief mention of *Commonwealth v. Ritchie, supra,* and acknowledges that the Supreme Court of the United States rejected this Court's majority view that an accused's rights of confrontation and compulsory process under the Sixth Amendment mandated compelled disclosure of confidential records maintained by a state agency charged with investigating child abuse. It is apparent, therefore, that *Commonwealth v. Ritchie* offers no support for today's decision and, in fact, seriously undermines this decision. In the absence of compelling reasons to justify more expansive compulsory discovery rights under the Pennsylvania Constitution than under the Constitution of the United States, the interpretation of the confrontation and compulsory process clauses of the Sixth Amendment, and of the due process clause as well, by the United States Supreme Court in *Pennsylvania v. Ritchie* should provide the framework for decision under our Constitution. Our Superior Court has consistently interpreted Article I, section 9 in accord with the United States Supreme Court's Sixth Amendment interpretation and analysis set forth in *Pennsylvania v. Ritchie. See, e.g. Commonwealth v. Kyle, supra; Commonwealth v. Byuss,* 372 Pa.Super. 395, 539 A.2d 852, 854–55 (1988); *Commonwealth v. Nissly,* 379 Pa.Super. 86, 549 A.2d 918 (1988).

Finally, it is certainly within this Court's authority and perogative to provide greater protections to criminal defendant's under provisions of this Commonwealth's constitution than under its federal counterparts. *Commonwealth v. Sell,* 504 Pa. 46, 63, 470 A.3d 457 (1983). However, departure from well reasoned constitutional analysis of the

454

United States Supreme Court should certainly be accompanied by some substantial analysis of our Pennsylvania Constitution and a reasoned explanation for the departure; instead substantial analysis and reasoned explanation are conspicuously absent. In fact, the majority's constitutional analysis comes down to just one case—the majority holds that the defendant's right to inspect psychotherapeutic records is mandated by the confrontation and compulsory process clauses of Article I, section 9, and states "Our reasoning in this regard is guided by this Court's decision in *Commonwealth v. Smith*, 417 Pa. 321, 208 A.2d 219 (1965)." Op. at 1359.

This exclusive reliance upon *Smith* is completely unjustified. Initially, it is somewhat anomalous that the majority looks to *Smith* for guidance under the Pennsylvania Constitution. The anomaly is this: *Smith* was analyzed under the Sixth Amendment, although a footnote informs us that the constitutional analysis is "equally applicable" to Article I, section 9 of our constitution. 417 Pa. at 329, n. 2, 208 A.2d at 223, n. 1a. If the respective state and federal constitutional provisions are indeed "equally applicable," then interpretations of the Sixth Amendment by the United States Supreme Court should be "equally applicable" to analysis of Article I, section 9. Yet, as we know, the majority ignores the interpretation and analysis of the Sixth Amendment by that Court in *Pennsylvania v. Ritchie*, and offers no reason for its deviation from said interpretation/analysis.

*Smith* also involved a defense request for "Jencks" material, i.e. prior statements of Commonwealth witnesses made to Federal Bureau of Investigation officials during a federal investigation of the matters for which the defendant was being prosecuted in state court criminal proceedings. It was also an important factor in *Smith* that the requested "Jencks" statements were in the possession of a law enforcement agency. As Justice Musmanno observed:

If the case at bar were being tried in a federal court, there can be no question that the FBI statements here under focal attention would be supplied to the defendant

and they would be used at the trial. Nor can there be any surmise that if the Sweet and Cocoran statements had been collected by the Pennsylvania State Police, this Court would order the State Police to surrender the statements to the defendant for his trial in the State court. With this irrefutable premise, it can only be a paradox beyond compare to say that, because this case adds up the guarantees of both Federal and State governments, that the total is less than the individual parts; that while Smith would be allowed federal documents in a federal court and state documents in a state court, he cannot, with both the Federal and State governments looking on, obtain a federal document to use in a state court, where his basic constitutional rights, both Federal and State, are involved. The law sometimes takes illogical turns, but this Court could not permit anything so illogical and so fundamentally unfair to take lodgment in the State Reports of this Commonwealth.

The most elementary principles of what "is deemed reasonable and right" dictate that Smith be allowed to see what witnesses have previously said to the government about him when they testify against him in court.

417 Pa. at 332, 208 A.2d at 225.

Finally, there was no claim in *Smith* that the information sought was privileged from compelled disclosure. Justice Musmanno's opinion took care to point out that, while the Solicitor General to the United States might have balked at the defendant's initial broad request to inspect the FBI's entire files on this investigation and might have asserted a privilege against disclosure thereof, the Solicitor General had *no objection* to disclosure of the two prior statements of witnesses specifically requested by the defendant.

In this case, the defense request was not limited to "Jencks" material (in fact defense counsel did not even ask to see prior statements of the child victim/prosecution witness), nor was the material requested in the possession of a prosecuting, law enforcement agency. Moreover, *the evidence/information sought in this case is protected by*

*several evidentiary testimonial privileges,* whereas no claim of privilege was asserted in *Smith.* Neither *Smith,* nor *Grayson,* nor *PAAR,* nor *Ritchie,* nor the Pennsylvania Constitution supports the majority's broad rule of compelled discovery which obliterates any and all testimonial privileges whenever the defendant can articulate some vague and general reason why he believes the information sought might be helpful.

This unprecedented decision today supports the observation that the criminal justice system has really not progressed very far in its treatment of rape victims who too often are treated as second class citizens by the courts. Because of the importance of today's decision, not only to numerous societal relationships heretofore receiving some measure of protection against compelled discovery of confidential communications but also to victims of sexual assault in particular, I will reprint at length some of the observations I made in my dissent in *PAAR* about the inadequacy of the legal response to the needs and interests of the rape victim:

LEGAL RESPONSE [TO THE RAPE VICTIM]

This unique social/cultural response to the victims of sexual assault has been legally reflected in (and exacerbated by) the peculiar procedural laws which, until surprisingly recently, have governed rape prosecutions. "Male fear of the false rape charge brought by a lying woman ... is written into the rape laws of various states in the form of special rules of evidence that are conspicuously absent from evidentiary rules governing other kinds of violent crime." *Brownmiller, supra, [Against Our Will: Men, Women and Rape* (Simon and Schuster 1975)] at 370 and *see* authority cited at 445.

Until recently, Pennsylvania had been one of the *most* "special" states in this regard. To begin, it is interesting to note that the complainant in a rape case has traditionally been dubbed the "prosecutrix". To this writer's knowledge, such terminology has only been employed in prosecutions for rape. While the term "prosecutrix" is on the wane, it still crops up on occasion. *See, e.g.,*

*Commonwealth v. Seigrist,* 253 Pa.Super. 411, 385 A.2d 405 (1978).

Perhaps the most pernicious of the "special" rules were the corroborating evidence requirement, and the jury instructions cautioning the jury to evaluate the complaining witness' testimony with "special care in view of her emotional involvement" and the "difficulty of determining the truth with respect to alleged sexual activities carried out in private." 18 Pa.C.S.A. § 3106 (repealed by the Act of Nov. 21, 1973, No. 115 § 2). These measures have been attributed to Lord Chief Justice Matthew Hale, the seventeenth-century English jurist, who wrote: "Rape is an accusation easily to be made and hard to be proved, and harder still to be defended by the party accused, tho never so innocent." Hale, *History of the Pleas of the Crown,* vol. 1, 634 (R.H. Small, 1847). It amazes me that "Lord Hale's instruction" had plagued the criminal prosecution system in Pennsylvania (and the "prosecutrix" as well) until 1973.

There was much more. Under the 1939 Penal Code, a defense to the crime of statutory rape read as follows:

"Upon the trial of any defendant charged with unlawful carnal knowledge and abuse of a woman child under the age of sixteen (16) years, *if the jury shall find that such woman child was not of good repute, and ... was with her consent,* the defendant shall be acquitted of rape, and be convicted of fornication." Act of June 24, 1939, P.L. 872 § 721. (Repealed and replaced by the Crimes Code, Act of Dec. 6, 1972, P.L. 1482, No. 334)

This provision produced abominable and absurd results. For example, in the case of *Commonwealth v. Perry,* 199 Pa.Super. 379, 185 A.2d 809 (1962), a father had raped his 15 year-old daughter on a rural township road. The defendant, after denying having intercourse with his daughter, had sought to introduce evidence that his daughter was not of good repute and that she had consented to the sex act. The trial court refused to allow

such evidence. Incredibly, and consistent with precedent, the Superior Court unanimously reversed, holding there was reversible error in the trial court's refusal to permit the father to "blacken the daughter's character." Apparently, the Superior Court was influenced by the fact that "[t]he girl did not make any outcry, or effort to seek aid, although cars passed [on the rural road] during this occurrence." 199 Pa.Super. 380, 185 A.2d at 810. That a daughter's chastity could *ever* be considered relevant to *the father's rape* of a daughter and that the father could prove his own daughter's lack of good repute and her consent is beyond offensive—it is one of the most repugnant legal rulings of which I can conceive.

And until 1976, it was a defense to a corruption of minors charge and to an indecent assault charge for a defendant to prove by a "preponderance of the evidence that the alleged victim had, prior to the time of the offense charged, engaged promiscuously in sexual relations with others." 18 Pa.C.S.A. § 3104 (repealed by the Act of May 18, 1976, P.L. 120, No. 53, § 1). While technically not applicable to prosecutions for rape, "impeachment" of a rape victim by evidence of prior sexual promiscuity was frequently an effective tactic used by defense counsel. *See* Note, 15 Duq.L.Rev. 155, 160 (1976); *Commonwealth v. Crider,* 240 Pa.Super. 403, 361 A.2d 352 (1976). [While such evidence is now theoretically inadmissible except as to prior sexual relations with the defendant where consent is an issue, 42 Pa.C.S.A. § 3104, "clever" ways of avoiding this evidentiary limitation are always being attempted, sometimes successfully. *See Commonwealth v. Jorgenson,* 512 Pa. 601, 517 A.2d 1287 (1986) (Larsen, J., dissenting).] There were also prompt reporting mandates until 1976 prohibiting prosecution unless a complaint was lodged within three months of its occurrence, 18 Pa.C.S.A. § 3105 (repealed by the Act of May 18, 1976, P.L. 120, No. 53 § 1), and requirements of reasonable resistance by the victim, 18 Pa.C.S.A. § 3121(2) (repealed by the Act of May 18, 1976, P.L. 120,

No. 53, § 2, 18 Pa.C.S.A. § 3107 (Supp.1980–81)). *See Commonwealth v. Moran,* 97 Pa.Super. 120, 2 A.2d 517 (1929) (actual resistance, outcry and prompt complaint are material elements of rape), *and Commonwealth v. Perry, supra.*

These rules peculiar to rape prosecutions quite naturally have contributed to the frequent feeling on the part of the rape victim that *she* was on trial. Witness these statements made by two rape victims:

> "They trotted out my whole past life, made me go through all these changes, while he just sat at the defendant's table, mute, surrounded by his lawyers. Of course that was his right by law, but it looked like I was the one who was on trial.
>
> \*     \*     \*     \*     \*     \*
>
> "I don't understand it. It was like I was the defendant and *he* was the plaintiff. I wasn't on trial. I don't see where I did anything wrong. I screamed. I struggled. How could they have decided that he was innocent, that I didn't resist."

*Brownmiller, supra* at 372–73.

One of the chief sponsors of the 1976 amendments to Pennsylvania rape laws, Senator Robert Jubelirer of Altoona in Blair County, noted "[w]e should have ... a situation now where the victim of the heinous crime of rape is no longer treated as the defendant and that the defendant can still receive a fair trial...." *Legislative Journal–Senate,* p. 1462 (April 6, 1976). The gross inadequacy and unfairness of former law and practice, as applied exclusively to the crime of rape, is highlighted in the following item:

> In urging the House of Delegates [of the American Bar Association] to approve a resolution calling for a redefinition of rape, Connie K. Borkenhagen of Albuquerque, New Mexico, pointed out one reason why most rape victims prefer not to press charges by imagining how it might sound if a robbery victim were

subjected to the kind of cross-examination that the rape victim usually must undergo:

(Q.) "Mr. Smith, you were held up at gunpoint on the corner of First and Main?"

(A.) "Yes."

(Q.) "Did you struggle with the robber?"

(A.) "No."

(Q.) "Why not?"

(A.) "He was armed."

(Q.) "Then you made a conscious decision to comply with his demands rather than resist?"

(A.) "Yes."

(Q.) "Did you scream? Cry out?"

(A.) "No, I was afraid."

(Q.) "I see. Have you ever been held up before?"

(A.) "No."

(Q.) "Have you ever *given* money away?"

(A.) "Yes, of course."

(Q.) "And you did so willingly?"

(A.) "What are you getting at?"

(Q.) "Well let's put it like this, Mr. Smith. You've given money away in the past. In fact, you have quite a reputation for philanthropy. How can we be sure that you weren't *contriving* to have your money taken from you by force?"

(A.) "Listen, if I wanted...."

(Q.) "Never mind. What time did this holdup take place, Mr. Smith?"

(A.) "About 11:00 P.M."

(Q.) "You were out on the street at 11:00 P.M.? Doing what?"

(A.) "Just walking."

(Q.) "Just walking? You know that it's dangerous being out on the street that late at night. Weren't you aware that you could have been held up?"

(A.) "I hadn't thought about it."

(Q.) "What were you wearing at the time, Mr. Smith?"

(A.) "Let's see ... a suit. Yes, a suit."

(Q.) "An *expensive* suit?"

(A.) "Well–Yes. I'm a successful lawyer, you know."

(Q.) "In other words, Mr. Smith, you were walking around the streets late at night in a suit that practically advertised the fact that you might be a good target for some easy money, isn't that so? I mean, if we didn't know better, Mr. Smith, we might even think that you were *asking* for this to happen, mightn't we?"

The Legal Bias Against Rape Victims, 61 American Bar Association Journal 464 (1975) (report of the 1975 American Bar Association Midyear Conference).

These legal oddities seem to have been designed to protect the male defendant from false accusations by women who "cry rape." *Brownmiller, supra* at 370; *see generally,* Drummond, *The Sex Paradox: An Analytical Survey of Sex and the Law in the United States Today* (Putnam 1953). "[T]he predominant interest seems to be protecting men from false complaints, not protecting females from being sexually assaulted or convicting those who are guilty of sexual assault." 3 Women's Rights Law Report 45, 54, Rutgers Law School, *Rape I* (1976). Perhaps this should not be surprising as the legal structure, from station house to bench, has been (and despite significant inroads continues to be) dominated by people who have been influenced by the myths of rape. It has been suggested that many law enforcement officials continue to cling to these myths ("all women want to be raped"; "she was asking for it"; "the woman will usually lie"—*Brownmiller, supra* at 311; *Ross, The Rights of Women: The Basic ACLU Guide to a Woman's Rights* 181–184 (1973)), doubting the victim's story perhaps because the crime was not reported immediately or because the victim appeared calm. As one rape victim phrased it, a woman must be "bruised, bloody, and damned near

dead" in order for the sexual assault not to be considered consensual. *Note, supra* [*The Victim in a Forcible Rape Case: A Feminist View,* 11 Am.Crim.L.Rev. 335 (1973)] at 347. *See also Brownmiller, supra* at 365–68; Krasner, Meyer and Carol, *Victims of Rape,* National Institute of Mental Health (1977) which analyzes a Philadelphia assault victim study made in 1973–75.

Many victims do not even bother to report a rape because they feel the process they must go through in order to obtain a conviction may be as offensive as the crime. *Note, supra* at 347. Most assuredly, many rape victims are treated kindly and professionally at the station house. However, the cultural myths still exist and still influence the handling of sexual assaults by the law enforcement agencies.

> Victims who have received aid at the Rape Crisis Center in Washington, D.C., report a wide range of treatment by the police. Some victims were satisfied with the treatment they received. At the other extreme were complaints about the police having made snide remarks, such as "How many orgasms did you have?," "I know why you got raped" or "Didn't I pick you up last week for prostitution?" Some of the police even harp over sexual details with relish—"How big was he?" and "What were you thinking about while he was doing it?" are questions victims have been asked. One woman said that although the rape was really bad, the police interrogation was six times as horrible. *Id.* at 347–48.

Small wonder that, given the imposing legal structure, rape ranks annually as the most underreported crime of violence in the United States. *Uniform Crime Reports,* Federal Bureau of Investigation 15 (Oct. 24, 1979).

There has *never been* a satisfactory rational justification for these unique legal barriers to a rape prosecution —indeed, none is possible. There is no reason to believe that a rape victim is more likely to "cry rape" falsely than

is an assault victim to "cry assault" falsely or a robbery victim to "cry robbery" falsely.

This examination of the legal response to rape is not intended merely as an academic exercise. It is, rather, intended to emphasize the appalling truth that the law—the criminal justice system—has not been a mere passive observer to the legal injustice perpetrated upon the rape victim, or to the legal bonanza afforded the rapist. It is fitting, then, that the law generally, and this Court particularly, embrace this opportunity to help to rectify the imbalance, to actively and affirmatively encourage the physical and psychological treatment of rape victims and the reporting of the crime to the police. We can do this by recognizing an absolute privilege for all communications made in the rape victim/crisis counselor relationship.

494 Pa. at 43–49, 428 A.2d at 140–43.

In the instant case, the "prosecution" of the six year old rape victim was conducted by defense counsel in a subtle manner. With no foundation placed on the record, defense counsel sought to inspect the highly personal and confidential psychotherapy files of the Psychiatric Institute because he "believed" from his investigation that this victim was hallucinating and delusional and had made similar accusations against others and was influenced to make these accusations by her mother. Nothing of this kind which his "investigation" supposedly uncovered was ever placed on the record to support his "beliefs," nor was any supporting evidence offered at trial. As he states in his brief, "Counsel urged the trial court that *he had reason to believe* that this [delusions, hallucinations, similar accusations, etc.] was the case....," yet even now counsel points to *nothing in the record* to support his nebulous beliefs and assertions. These assertions—"the victim may be delusional" and "the victim may have accused others of rape" and "the victim may have been put up to it"—sound like the same, tired old claptrap that has been exposed for what it is and suppos-

edly rejected by the courts as a legal basis for questioning and discrediting a rape victim.

Appellant strenuously argues that certain information which the trial court indicated was contained in her files would have been very helpful to the defense. This information was highly private, confidential and personal, and was exactly the sort of information that one would expect to be disclosed in psychotherapy and to remain privileged; the information was, according to the trial court, that this child victim "may have looked at her brother, and he may have looked at her nude. But there is nowhere in the records that indicates she made an accusation against anyone." N.T. August 2, 1985 at 92–93.

This confidential, privileged communication should not have been revealed to defense counsel, or to anyone for that matter, but it was revealed so let us deal with it. The fact that a six year old child may or may not have "looked at her brother, and he may have looked at her nude" has no bearing whatsoever upon this thirty-four year old defendant's repeated acts of perversion, sexual assault and rape of the child. No doubt defense counsel would find this information potentially "useful" to the defense—he could have tried to damage and blacken her innocent character with such information. But the law should not allow appellant to get in through the back door what he absolutely could not bring through the front, because this sort of information cannot be used as "evidence" or elicited from the victim at trial. 42 Pa.C.S.A. § 3104.

Under this section 3104, evidence of specific instances of a victim's "past sexual conduct" ... shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent ... is at issue and such evidence is otherwise admissible." Does appellant suggest that this six year old child consented to sexual relations with him? That is preposterous. *Commonwealth v. Rhodes*, 510 Pa. 537, 510 A.2d 1217 (1986). Is appellant somehow suggesting that because the victim may have seen her brother and been

seen by her bother in the nude that this somehow excuses/justifies his vile behavior, or maybe it shows that she seduced him? Ridiculous; a child's curiosity about nudity at the age of six is not synonymous with an adult's social/cultural attitude toward nudity and sexuality. This information which appellant now sees as his salvation is irrelevant and inadmissible (and completely privileged), and has no bearing on his bare, unsubstantiated assertions that the victim may have been delusional, or hallucinating or may have made a habit of accusing others of rape or was influenced by her mother.

Once again, I find myself in the position of having to plead with the legislature to do that which this Court should have done. Because this Court has refused to even acknowledge that some information and potential evidence may, in our society, be protected against disclosure by necessary and well recognized testimonial privileges, there is now no legal protection for confidential communications between a psychotherapy patient and her or his psychotherapist, not even when the psychotherapist is a psychiatrist. Psychotherapists in this Commonwealth will no longer be able to give their patients assurances of confidentiality. Thus the nature of the patient-psychotherapist relationship will be seriously altered, and the value of psychotherapy as an effective tool for the treatment of psychological and emotional injuries and problems will be drastically reduced by today's decision.

The damage to the psychotherapeutic profession, and more importantly to people like the innocent young child in the instant case who are in drastic need of psychotherapeutic help to help mend shattered lives and psyches, will be serious and poses a severe threat to the viability of psychotherapy as a useful and necessary tool for psychological healing. Psychotherapy is far from perfect, but it is the best treatment our society has to offer; or at least it was until today. I can only hope that the legislature will respond to this threat by enacting a patient-psychotherapist privilege co-extensive with the patient-psychologist privi-

lege, 42 Pa.C.S.A. § 5944, to protect and preserve the vitality of such relationships by maintaining the confidentiality of communications generated therein. Such a privilege would surely cover the patient-psychiatrist relationship, and also a patient's relationship with any other psychotherapist which the legislature would deem to be sufficiently trained, experienced, etc. to warrant similar treatment.

For the foregoing reasons, I must emphatically dissent.

PAPADAKOS, J., joins in this dissenting opinion.